PREMIER ASSOCIATES, LTD., Appellant and Cross–Appellee,

v.

LOPER, Appellee and Cross–Appellant.

[Cite as *Premier Assoc., Ltd. v. Loper,* 149 Ohio App.3d 660, 2002-Ohio-5538.]

Court of Appeals of Ohio,
Second District, Champaign County.

No. 2002 CA 8.

Decided Oct. 11, 2002.

Joseph A. Zannieri, for appellant and cross-appellee.

William R. Groves, for appellee and cross-appellant.

WOLFF, Presiding Judge.

{¶ 1}   Premier Associates, Ltd. ("Premier") appeals from a judgment of the Champaign County Court of Common Pleas, which granted summary judgment on behalf of Thomas E. Loper ("Loper").   Loper has also filed a cross-appeal.

{¶ 2} The undisputed facts of this case are as follows.

{¶ 3} Loper, a psychologist, had been employed by Geri–Tech, Inc. ("Geri–Tech"), which was owned by Rita Baumeister. Upon Rita's death in September 1995, Geri–Tech was purchased by Premier, owned by her husband Leroy Baumeister ("Baumeister"). Premier contracted with nursing homes to provide psychological services to their residents. It employed psychologists, such as Loper, to provide these services. To this end, Loper entered into an employment contract with Premier on September 18, 1995, the same day on which his employment with Geri–Tech was terminated. The contract between Loper and Premier contained several clauses relevant to this appeal: a covenant not to compete, an arbitration clause, and a controlling-law provision.

{¶ 4} On June 9, 1998, Baumeister apparently decided to close Premier. According to his daughter, Melinda Langston ("Langston"), also the company's director of finance, Baumeister ordered her to "shut things down." On June 10, 1998, Premier sent letters to all of its employees, including Loper, which stated:

{¶ 5} "This letter is to inform you that your employer, PREMIER Associates, Ltd., will cease business operations and begin winding up its corporate affairs effective immediately. According to your employment contract, paragraph 11(c) [sic], this letter shall serve as PREMIER Associates, Ltd.'s intent to terminate your employment contract. As that paragraph requires ten (10) days notice, your employment shall cease at close of business day on June 22, 1998."

{¶ 6} The only employees who did not receive this letter were those few necessary to finish winding up the financial affairs of the company. Pursuant to Loper's employment contract, he was entitled to thirty days' notice for termination without cause; however, under paragraph 9(c) of the employment contract, Premier could terminate him with only ten days' notice in the event that it made a decision to "terminate its business and liquidate its assets." Premier invoked this provision and terminated Loper and its other employees with only ten days' notice.

{¶ 7} Premier also sent letters to its nursing home customers terminating those contracts. These letters stated: "This letter shall serve as Premier Associates, Ltd.'s thirty (30) day notice of intent to terminate its services with your facility. Services from Premier Associates, Ltd. shall cease on July 12, 1998." This letter was sent to all of the approximately eighty nursing homes that were under contract with Premier in June 1998.

{¶ 8} Premier also instructed its director of marketing to "pitch" all of her marketing materials and customer files. The Regional Chief Administrative Officer for Eastern Ohio, Glyn Borden ("Borden"), was ordered to throw away all of her personnel files. Furthermore, Borden and the Regional Chief Administra-

tive Officer for Western Ohio, Jeff Weiner ("Weiner"), were directed to tell the psychologists that their employment was immediately terminated and that the company would not seek to enforce the covenants not to compete if the psychologists wished to continue providing services to the nursing homes. According to Loper, he was so advised by Weiner and thereafter arranged to continue providing services to the nursing homes where he had previously worked.

{¶ 9} The following week, Premier sent a letter to its psychologists, which stated:

{¶ 10} "If you have any interest in continuing to provide services directly to the skilled nursing facilities in which you currently operate, then you may contact the corporate office to discuss this matter further before June 30, 1998."

{¶ 11} This letter was apparently the result of a discussion between Baumeister, Langston, and Premier's attorney, Jeff Rengle ("Rengle"), in which the three discussed that the covenants may have some value to the company. Baumeister was apparently beginning to entertain ideas of selling the company at this point rather than shutting down. Loper did not respond to the letter. Rengle sent another letter to former employees of Premier, including Loper, on July 27, 1998, advising them that Premier was still a "viable" company and demanding that they cease and desist violating the covenant not to compete. This letter also expressed an interest in "continuing" Loper's employment with Premier.

{¶ 12} Premier did not go out of business. Rather, Baumeister sold the business to Jackson Properties, Ltd., a limited liability company owned by Rengle. The name of the company did not change. Premier filed a complaint against Loper in the Erie County Court of Common Pleas on July 29, 1999, alleging that Loper had breached the employment agreement between the parties by violating the covenant not to compete and a covenant not to disclose confidential information. The complaint also alleged that Loper had taken trade secrets of Premier in violation of R.C. 1333.61 and 1333.81 and had misappropriated Premier's insurance and Medicaid billing number. Among other things, Premier requested that Loper be enjoined from competing with Premier.

{¶ 13} Loper filed a motion to transfer venue on September 9, 1999. On November 30, 1999, the Erie County Court of Common Pleas granted Loper's motion and transferred the case to the Champaign County Court of Common Pleas. On December 20, 1999, Loper filed a motion requesting attorney fees and costs accrued in connection with the motion to transfer venue. The trial court denied that motion on June 27, 2001.

{¶ 14} Loper filed a motion for summary judgment on December 22, 2000, with respect to all four claims in Premier's complaint. The trial court denied that motion on June 27, 2001. Following some discovery, Loper filed a renewed

motion for summary judgment on January 9, 2002. That motion addressed only Premier's argument that Loper had violated the covenant not to compete. Premier responded on January 24, 2002, and Loper filed a reply on January 29, 2002. On January 30, 2002, the trial court granted Loper's motion for summary judgment, dismissing all four claims.

{¶ 15} Premier appeals, raising two assignments of error.

{¶ 16} "I. The Champaign County Common Pleas Court erred when it granted summary judgment to Tom E. Loper."

{¶ 17} Our review of the trial court's decision to grant summary judgment is de novo. See *Helton v. Scioto Cty. Bd. of Commrs.* (1997), 123 Ohio App.3d 158, 162, 703 N.E.2d 841. Civ.R. 56(C) provides that summary judgment may be granted when the moving party demonstrates that (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made. See *State ex rel. Grady v. State Emp. Relations Bd.* (1997), 78 Ohio St.3d 181, 183, 677 N.E.2d 343; *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 65–66, 8 O.O.3d 73, 375 N.E.2d 46.

{¶ 18} Premier makes two arguments relating to the trial court's application of the summary judgment standard. Initially, it notes that the trial court made the following statement in its decision granting Loper's motion for summary judgment: "The Court has determined that considering the evidence most strongly in favor of the Defendant, reasonable minds can come to but one conclusion, and that conclusion is adverse to the Plaintiff." Clearly, the trial court was in error in making this statement because the summary judgment standard requires the evidence to be construed most strongly in favor of the nonmoving party, which in this case was Premier, the plaintiff. However, the trial court's statement appears to have been merely a clerical error. Regardless, we give no deference to the trial court's decision on a motion for summary judgment, see *Snook v. Ford Motor Co.* (2001), 142 Ohio App.3d 212, 215, 755 N.E.2d 380, and any error on the part of the trial court in applying the summary judgment standard will be cured by our de novo review of the case.

{¶ 19} Premier's second argument is that the trial court could not grant summary judgment in favor of Loper because this was a case of first impression in Ohio. It argues that a party cannot be entitled to judgment as a matter of law where there is no controlling law on the issue. Premier has not cited any law to support this conclusion. As a general principle, we do not believe that the absence of Ohio law on an issue forestalls a court from granting a motion for

summary judgment. It is the function of the court to interpret the law, and, where the law on an issue is unestablished or unclear, to say what the law is. However, as discussed infra, the trial court's decision is consistent with established principles of interpreting covenants not to compete, and this court has recently decided a case involving a similar issue. Thus, this was not a situation where there was no applicable law to guide the court.

{¶ 20} Turning to Premier's substantive arguments, the Supreme Court has held that a covenant not to compete "which imposes unreasonable restrictions upon an employee will be enforced to the extent necessary to protect the employer's legitimate interests. A covenant restraining an employee from competing with his former employer upon termination of employment is reasonable if it is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public." *Raimonde v. Van Vlerah* (1975), 42 Ohio St.2d 21, 25–26, 71 O.O.2d 12, 325 N.E.2d 544. "The purpose in allowing non-competition agreements is to foster commercial ethics and to protect the employer's legitimate interests by preventing *unfair* competition—not ordinary competition. Therefore, the agreement must be reasonable before it will be enforced, and there must be a weighing of the interests of the employer, the employee, and the public to determine what is reasonable. If there is no legitimate interest of the employer to protect, then any non-competition agreement is not reasonable." (Emphasis sic.) *Westco Group, Inc. v. City Mattress* (Feb. 15, 1985), Montgomery App. No. 12619, 1985 WL 144712. While covenants not to compete are disfavored in the medical profession, they are not per se unreasonable. *Ohio Urology, Inc. v. Poll* (1991), 72 Ohio App.3d 446, 451, 594 N.E.2d 1027.

{¶ 21} The trial court concluded that there was a de facto termination of Premier that Loper was entitled to rely upon and that the covenant not to compete was therefore unenforceable. Although our reasoning differs somewhat from that of the trial court, we agree that the covenant is unenforceable.[1]

{¶ 22} As Premier notes, Ohio law permits the assignment of covenants not to compete. See, e.g., *Artromick Internatl. v. Koch* (2001), 143 Ohio App.3d 805, 809–810, 759 N.E.2d 385. Premier argues that it never went out of

---

1. Premier argues that, because the Erie County Court of Common Pleas granted its request for a preliminary injunction, the Champaign County court and this court are limited to deciding whether it is also entitled to damages. Thus, Premier appears to believe that the Erie County court concluded that the covenant was enforceable. However, the Erie County injunction was entered solely to preserve the status quo and in no way decided any substantive issue of the case. Therefore, the issue before the Champaign County court and this court is the enforceability of the covenant. Practically, the time during which the employment contract forbade Loper from competing with Premier has already passed and the restrictions of the preliminary injunction have been lifted.

business and that the covenant not to compete therefore remained in effect following the termination of employees and customer contracts. According to Premier, the covenant was assigned to the new owner when the company changed hands. This appears to be the only factual issue in the case. Construing the evidence in favor of Premier, we conclude that Premier did not ever go out of business and that the covenant was assigned to the new owner. However, we do not believe that this decides the enforceability of the restrictive covenant. We must still determine whether it is reasonable to enforce the covenant. In other words, the sale of the business had no effect upon the enforceability of the covenant. The question before us is whether Premier's actions prior to selling the business made enforcement of the covenant unreasonable or unjust.

{¶ 23} In that regard, Premier argues that it had legitimate interests in its good will with its customers and in being able to rehire its employees and reestablish relationships with its customers. Loper argues that the actions of Baumeister destroyed the good will of Premier and that Premier had no legitimate interests to protect at the time that Loper began servicing the nursing homes directly. Loper also argues that waiver and estoppel bar Premier from attempting to enforce the covenants.

{¶ 24} Premier argues that it had a legitimate interest in protecting its relationships with its customers. This is essentially Premier's "good will." To support its argument, Premier cites *Wall v. Firelands Radiology, Inc.* (1995), 106 Ohio App.3d 313, 666 N.E.2d 235. In that case, the Sixth District Court of Appeals enforced a noncompetition agreement between a radiologist and her former employer and enjoined the radiologist from practicing at hospitals with which Firelands Radiology had a contract to provide radiology services. Id. at 334, 666 N.E.2d 235. The court concluded that Firelands was dependent upon the contracts with the hospitals for its business and that the radiologist should not be permitted to use contacts she had obtained during her employment to destroy a relationship between Firelands and the hospital that had been established prior to her employment. Id. at 331, 666 N.E.2d 235. Thus, the court concluded that the covenant not to compete was reasonable and enforceable. Id. at 334, 666 N.E.2d 235. Premier argues that this case is parallel to *Wall* in that Loper developed relationships with the nursing homes during his employment with Premier and then used those relationships to compete with Premier after his employment was terminated. However, this case is readily distinguishable from *Wall* because, in that case, Firelands had not terminated its contract with the hospital prior to Wall's attempting to practice at the hospital.

{¶ 25} Loper cites several cases that are more similar to this case. In *Gibson v. Eberle* (Colo.App.1988), 762 P.2d 777, a Colorado appellate court examined a similar situation. Gibson, the employer, closed his business and went

to work for another company. He then attempted to enforce a covenant not to compete against a former employee, Eberle. The court of appeals concluded that, because Gibson's business had ceased to exist, Eberle was not competing with it. The court noted that the right to enforce "a covenant ends with the termination or abandonment of the business to which the covenant was ancillary." Id. at 779. Such abandonment extinguishes the covenant. Id. While we recognize that Gibson took more steps toward going out of business than did Premier, we do not read the case to rely on that fact. Rather, *Gibson* is instructive that an employer which abandons its business may not enforce a covenant not to compete.

{¶ 26} Moreover, this court recently dealt with a similar situation in *Premier Health Care Serv., Inc. v. Schneiderman*, Montgomery App. No. 18795, 2001 WL 1658167.[2] In that case, Premier Health Care Services ("PHCS") contracted with various hospitals to run their emergency rooms. PHCS hired physicians to provide these services, one of whom was Schneiderman. PHCS then fired Schneiderman and other employees, which caused the hospital at which Schneiderman had worked to cancel its contract with PHCS. The hospital contracted with another service provider, which had hired the employees that PHCS had terminated. PHCS then sought to enforce the covenant not to compete against Schneiderman and other employees. We concluded as follows:

{¶ 27} "Although at the time of the signing of the employment agreement between the parties a legitimate business interest may have existed for the injunction in [PHCS's] preserving [its] exclusive contract with [the hospital], at the time [PHCS] sought a preliminary injunction preventing all sixteen Physicians from working at [the hospital's emergency trauma center] in October of 2000, this legitimate business interest no longer existed because [the hospital] had terminated the contract with [PHCS]. Also, [the hospital] would no longer contract with [PHCS] because of this experience * * *. Therefore, since the contract between [the hospital] and [PHCS] was terminated at the time of the

---

2. Premier argues that our decision in *Schneiderman* has no controlling authority under Rule 2(G) of the Supreme Court rules for the reporting of Opinions. This argument is flawed for two reasons. First, whether the case is reported or not, it is a reflection of the views of this court. Second, the Rules for the Reporting of Opinions were revised effective May 1, 2002. The revised rules abolish the designations of "controlling" and "persuasive" authority based upon whether a case was published in the Ohio Official Reports, R.Rep.Op. 4(A), and provide that "[a]ll court of appeals opinions issued after the effective date of these rules may be cited as legal authority and weighted as deemed appropriate by the court," R.Rep.Op. 4(B). While the new rule applies to cases decided after its effective date, the reasoning behind it is equally applicable to cases decided earlier. Furthermore, we are confident that Premier would not want this court to conclude that the persuasive value of the unreported cases cited in its brief was "exceedingly limited" or that the precedential value of these cases was "nil."

request for the injunction, [PHCS] no longer had a legitimate business interest in protecting and preserving the contract." Id.

{¶ 28} We find the case sub judice to be remarkably similar to *Schneiderman*. In this case, Premier had terminated its psychologists' contracts and cancelled its contracts with all its nursing home customers at the time Loper began providing services for several nursing homes directly. Even the dissent in *Schneiderman* recognized that it would be inequitable to enforce a covenant not to compete where the employer seeking to enforce the covenant had terminated its contract with its customers. *Schneiderman*, supra (Fain, J., dissenting) ("If [PHCS] fails to renew its contract with [the hospital] to provide emergency room services, it has abandoned its competitive interest in those services, and it would obviously be inequitable for it to enforce a covenant not to compete under those circumstances."). Thus, at the time Loper began competing with Premier, Premier had abandoned its competitive interest in servicing the nursing homes in question. In addition, when Premier began attempting to reestablish contracts with its previous customers, it appeared to recognize that it was in no better position with respect to those customers than any other company attempting to contract with them, and that it was possibly in a worse position due to its precipitant cancellation of contracts. This is evidenced by a letter Premier sent to its former customers:

{¶ 29} "We have gone back into many of the facilities that we serviced prior to the upheaval to explain our new company, its new management and our renewed commitment to service in a more efficient manner. While you are under no obligation to continue or renew any service whatsoever with us, nevertheless we would like to add your facility to our list of those facilities who would give us the same opportunity as any other new company. In short, we are asking for the opportunity to prove that Premier, with its new management, is capable of again providing quality care and much needed counseling services to your patients/residents."

{¶ 30} Premier argues that *Schneiderman* is distinguishable because it involved the potential shutdown of an emergency room, whereas the case sub judice involved no danger of a facility being shut down. Premier further argues that a geriatric patient "does not usually suffer harm" if psychological care is interrupted briefly. However, we do not believe, as Premier seems to contend, that lives must be in danger in order for the public to be harmed by the enforcement of a covenant not to compete. Enforcement of the covenant not to compete in this situation could adversely affect the patients to whom Loper provided care. Absent a legitimate business interest of Premier, this is sufficient harm to the public to render the covenant unreasonable. Premier also argues that, in *Schneiderman*, PHCS had admitted that it had no legitimate interest following

(

the termination of the contract with the hospital. While this was a factor contributing to this court's decision in *Schneiderman,* we do not believe that the result would have been different had PHCS consistently argued that it had a legitimate interest. Regardless of PHCS's arguments, it did not have a legitimate interest to protect following the hospital's termination of the contract.

{¶ 31} Based upon the facts of this case, we do not believe that Premier had a legitimate interest in protecting its customer relationships at the time Loper began to compete with Premier. Those relationships had already been destroyed by Premier itself, leaving the nursing homes to find some way to provide psychological services to their residents as required by federal law. The fact that some nursing homes were willing to give Premier a second chance does not negate the fact that it had cancelled its contracts. It was, in effect, starting over with those nursing homes and attempting to build new relationships. We believe that enforcing the covenant not to compete in this situation would be unreasonable and unjust. A covenant not to compete is not designed to protect an employer who summarily terminates its employees and cancels all its customer contracts but then changes its mind and wants its business back. Premier is essentially seeking protection from ordinary competition, to which it is not entitled.

{¶ 32} For the foregoing reasons, we conclude that the trial court did not err in granting Loper's motion for summary judgment. Based upon our resolution of this issue, we find it unnecessary to reach the issues of estoppel and waiver.

{¶ 33} We must also briefly address the other three claims in Premier's complaint: taking of trade secrets, disclosure of confidential information, and misappropriation of insurance billing numbers. While Loper's initial motion for summary judgment, which was denied, addressed all four of these claims, the second motion for summary judgment addressed only the covenant not to compete. The trial court granted that motion and dismissed all four claims. Premier has addressed only the covenant not to compete in its appellate brief; therefore, Loper argues that Premier has waived any appeal from the dismissal of the remaining claims. In its reply brief, Premier argues that this assignment of error was "specific enough" for us to overturn the trial court's decision and send the case back on all four claims. Premier further argues that it was not necessary for it to assign error since the trial court did not make a decision with respect to the other three claims. Premier apparently believes that, if we reverse the summary judgment on the claim involving the covenant not to compete, the remaining three claims will likewise be reopened. This belief is erroneous. The trial court dismissed all four claims. We will not decide whether it was correct in doing so as Premier has waived that argument by failing to raise it in its initial brief in this appeal. Premier's brief discussed only the covenant

not to compete and did not assign error to the trial court's dismissal of its remaining claims. Thus, we conclude that Premier has waived any error committed by the trial court with respect to the taking of trade secrets, disclosure of confidential information, and misappropriation of insurance billing numbers claims.

{¶ 34} Premier's first assignment of error is overruled.

{¶ 35} "II. The Erie County Common Pleas Court erred when it transferred this case to Champaign County."

{¶ 36} Under this assignment of error, Premier argues that the trial court abused its discretion in transferring this case to Champaign County because venue was proper in Erie County pursuant to Civ.R. 3(B)(6) and because the language of the employment contract provided that disputes would be litigated in Erie County.

{¶ 37} We review the trial court's decision on a motion to change venue for abuse of discretion. See *State ex rel. McCoy v. Lawther* (1985), 17 Ohio St.3d 37, 38, 17 OBR 30, 476 N.E.2d 1048. "Abuse of discretion connotes more than an error of law or of judgment; it implies that the court's attitude was unreasonable, arbitrary or unconscionable." See *Tracy v. Merrell Dow Pharmaceuticals, Inc.* (1991), 58 Ohio St.3d 147, 152, 569 N.E.2d 875. Furthermore, it is the role of the trial court to determine which of the criteria in Civ.R. 3 have priority over others. See *McCoy,* supra.

{¶ 38} In granting Loper's motion to transfer venue to Champaign County, the trial court stated:

{¶ 39} "Erie County is not the proper venue, and the employment agreement which is the subject of this action does not contain a venue or forum selection clause. However, venue is proper in Champaign County under several of the provisions of Civil Rule 3(B). First, Defendant resides there. Civil Rule 3(B)(1). Second, Defendant's principal place of business is there. Civil Rule 3(B)(2). Third, one of the long term care facilities at which he provides services is located there. Civil Rule 3(B)(6)."

{¶ 40} Premier first argues that venue was proper in Erie County, where it filed the case. It points to a variety of activities related to the claim in this case that occurred or were alleged to have occurred in Erie County: Premier did not provide Loper with a copy of the employment agreement, Loper was terminated, Premier cancelled its contracts with its customers. Thus, Premier argues that significant activity of the plaintiff in this case (Premier) took place in Erie County, making it a proper venue under Civ.R. 3(B)(6). It also cites *Gen. Motors Acceptance Corp. v. Jacks* (1971), 27 Ohio Misc. 115, 56 O.O.2d 93, 268

N.E.2d 833, for the proposition that venue is proper under Civ.R. 3(B)(6) in the county in which the plaintiff conducted significant activity related to the claim. In that case, the court concluded that the subject of the cause of action (a default on a loan giving rise to the repossession of an automobile and a lawsuit for the deficiency) occurred in Montgomery County. Id. at 119–120, 56 O.O.2d 93, 268 N.E.2d 833.

{¶ 41} In an action for a breach of contract, the cause of action arises where the breach takes place. See *Soloman v. Excel Marketing, Inc.* (1996), 114 Ohio App.3d 20, 25, 682 N.E.2d 724. The breach of the employment agreement alleged by Premier occurred, if at all, in the counties where Loper treated patients of the former nursing-home customers of Premier. Those counties are Champaign, Clark, and Logan. Thus, venue was not proper in Erie County under Civ.R. 3(B)(6). Furthermore, the trial court also considered the factors of Civ.R. 3(B)(1) and (2), Loper's residence and Loper's place of business. Thus, the trial court was well within its discretion in transferring venue to Champaign County under Civ.R. 3(B).

{¶ 42} Premier also argues that the employment contract contained a venue-selection clause requiring the case to be decided in Erie County. It points to the following provisions in the contract:

{¶ 43} "10. ARBITRATION. Any controversy or claim arising out of, or relating to this Agreement, or the breach thereof, shall be settled by arbitration in the City of Sandusky in accordance with the rules then obtaining of the American Arbitration Association, and judgment upon the award rendered may be entered and enforced in any court having jurisdiction thereof. Such arbitration shall use the services of three (3) arbitrators, with one (1) arbitrator chosen by the Employee, one (1) arbitrator chosen by Premier Associates, Ltd., and one (1) arbitrator chosen by both these arbitrators.

{¶ 44} "* * *

{¶ 45} "18. CONTROLLING LAW. The laws of the State of Ohio and Erie County, Ohio shall govern the construction, validity, interpretation, performance, and making of this Agreement.

{¶ 46} "* * *

{¶ 47} "IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed at Sandusky, Ohio, on the date first above written."

{¶ 48} Premier's contentions to the contrary notwithstanding, the arbitration clause and signature clause have no relevance to the issue before us. While the arbitration clause clearly states the location in which an arbitration was to be held, it does not select a forum in which a lawsuit should be filed. The

signature clause merely states where the contract was signed and in no way selects a venue. Therefore, we will consider only the controlling law clause of the employment contract.

{¶ 49}  Forum-selection clauses are enforceable in Ohio so long as they are reasonable and just. See *Kennecorp Mtge. Brokers, Inc. v. Country Club Convalescent Hosp., Inc.* (1993), 66 Ohio St.3d 173, 176, 610 N.E.2d 987. See, also, *The Bremen v. Zapata Off-Shore Co.* (1972), 407 U.S. 1, 9–12, 92 S.Ct. 1907, 32 L.Ed.2d 513. In *Kennecorp*, the Supreme Court of Ohio enforced the following clause in a contract to require a case to be litigated in Ohio: "All laws pertaining to this agreement shall be goverened [sic] by the laws of the state of Ohio, as well as jurisdiction shall be in the Ohio courts." 66 Ohio St.3d at 173, 610 N.E.2d 987.

{¶ 50}  Premier first argues that the controlling law clause clearly requires jurisdiction in Erie County because it provides that the "laws" of Erie County (the local rules) will apply to the case and those rules can only be applied by the Erie County court. It further argues that the controlling law provision in this case is analogous to the choice of law/forum selection clause in *Kennecorp*. Premier argues that, because jurisdiction is proper only in Ohio, the statement that jurisdiction shall be in Ohio would have been "surplusage" in the Premier employment contract. Therefore, since the jurisdictional statement was unnecessary, we should read the controlling-law provision as a forum-selection clause since that provision provides that Erie County local rules will be used. Barring that, we are apparently to read the controlling-law provision together with the arbitration clause and signature clause to conclude that the intent of the parties was that venue would be in Erie County. Loper argues that the clause is merely a choice-of-law clause.

{¶ 51}  We agree with Loper. The controlling-law provision in the contract is a choice-of-law clause. It makes no provision for venue. Furthermore, the local rules of Erie County are merely procedural rules, which do not prevail over statutory provisions. See, e.g., *State ex rel. Glass v. Reid* (1991), 62 Ohio App.3d 328, 331, 575 N.E.2d 516. Premier has not identified any local rule of Erie County that would require a different outcome in this case. If Premier intended the contract to contain a forum-selection clause, it would have been very simple to include a provision stating that disputes would be litigated in Erie County, Ohio. However, Premier did not include such a provision in the contract, and we will not read a forum-selection clause into the contract where one does not exist.

{¶ 52}  Premier's second assignment of error is overruled.

{¶ 53}  In his cross-appeal, Loper raises one assignment of error:

{¶ 54} "The Champaign County Court of Common Pleas abused its discretion in denying Dr. Loper's motion for attorney's fees in connection with his successful motion to transfer venue."

{¶ 55} Civ.R. 3(C)(2) provides:

{¶ 56} "When an action is transferred to a county which is proper, the court may assess costs, including reasonable attorney fees, to the time of transfer against the party who commenced the action in a county other than stated to be proper in division (B) of this rule."

{¶ 57} Such sanctions are designed to "place a curb upon the party who deliberately or heedlessly files an action in a county where venue is not proper thereby causing these additional expenses." *State ex rel. Paul v. Ohio State Racing Comm.* (1989), 60 Ohio App.3d 112, 120–121, 574 N.E.2d 587.

{¶ 58} The Champaign County Court of Common Pleas concluded that "the filing of the original lawsuit in Erie County did not rise to the level to justify an award of attorney's fees in connection with the changing of venue.  * * * The filing in Erie County was not heedless of venue considerations because of the grounds alleged for venue and the preliminary relief sought."  We review this decision for abuse of discretion.  See *Ohio Student Loan Comm. v. Rodner* (1991), 68 Ohio App.3d 397, 400, 588 N.E.2d 304.

{¶ 59} While we have concluded that Premier's arguments regarding venue are not persuasive, we cannot conclude that the trial court abused its discretion in concluding that Premier's filing of suit in Erie County was not so heedless of venue considerations at to justify an award of attorney's fees.

{¶ 60} Loper's assignment of error is overruled.

{¶ 61} The judgment of the trial court will be affirmed.

Judgment affirmed.

GRADY and FREDERICK N. YOUNG, JJ., concur.