[Cite as *Castillo-Sang v. Christ Hosp. Cardiovascular Assocs., L.L.C.*, 2020-Ohio-6865.]

# IN THE COURT OF APPEALS

# FIRST APPELLATE DISTRICT OF OHIO

# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| MARIO CASTILLO-SANG, M.D., | : | APPEAL NO. C-200072 |
| | | TRIAL NO. A-1905278 |
| Plaintiff-Appellee, | : | |
| | : | |
| vs. | : | *O P I N I O N.* |
| | : | |
| THE CHRIST HOSPITAL | | |
| CARDIOVASCULAR ASSOCIATES, | : | |
| LLC, | : | |
| | | |
| Defendant-Appellant. | : | |

Civil Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  December 23, 2020

*The Janszen Law Firm* and *August T. Janszen,* for Plaintiff-Appellee,

*Vorys Sater Seymour and Pease LLP*, *Nathaniel Lampley, Jr.*, and *Emily E. St. Cyr*, for Defendant-Appellant.

**MYERS, Presiding Judge.**

{¶1}   The Christ Hospital Cardiovascular Associates, LLC, ("TCHCVA") appeals the trial court's judgment granting a preliminary injunction in favor of former employee Mario Castillo-Sang, M.D., that enjoined TCHCVA from enforcing a covenant not to compete contained in Castillo-Sang's employment agreement. Because the trial court did not abuse its discretion in granting the preliminary injunction in favor of Castillo-Sang, we affirm the trial court's judgment.

### *Background*

{¶2}   Castillo-Sang was hired by TCHCVA in May 2015 as a cardiothoracic surgeon.  In addition to performing other open-heart and cardiothoracic surgeries, Castillo-Sang specializes in two specific cardiovascular procedures: minimally invasive mitral valve repair and replacement ("Mitral Valve") and left ventricular assist device therapy ("LVAD").

{¶3}   The Mitral Valve surgical procedure involves performing open-heart surgery through a two-inch incision in the right chest and a one-inch incision in the groin, rather than the traditional sternotomy surgical procedure, which involves cutting through the patient's breastbone to perform the mitral valve repair or replacement.  The Mitral Valve procedure allows the surgery patient to recover faster, with less pain and less need for narcotics.  It also requires fewer blood transfusions and a shorter hospital stay for the patient.  LVAD is a cardiovascular surgical procedure in which a mechanical pump is implanted into a patient with heart failure, enabling the bottom left chamber of the heart to pump blood out of the ventricle to the aorta.

{¶4}   When TCHCVA hired him in 2015, Castillo-Sang was an expert in Mitral Valve and LVAD surgical procedures.  Castillo-Sang developed his expertise during his cardiothoracic surgical residency at the Washington University School of

Medicine, during his additional training in Minimally Invasive Mitral Surgery at the Leipzig Heart Center, and during his surgical experience at the Medical University of South Carolina. While at TCHCVA, he gained more experience and expertise.

{¶5} Castillo-Sang's employment agreement with TCHCVA contained a covenant not to compete which provided in relevant part:

> * * * During Physician's employment under this Agreement and for a period of twelve (12) months following the termination of such employment (the "Restricted Period"), Physician shall not, within Hamilton County and all contiguous counties (the "Restricted Area") personally or through any agent or family member in any manner, engage directly or indirectly, in any business activity which is directly or indirectly competitive with the Medical Practice's or TCHCVA's or Hospital's operations * * *.

Employment Agreement, Section 11.B.

{¶6} Castillo-Sang also agreed to keep secret and not disclose or use "TCHCVA's programs, staff recruitment programs, trade secrets, patient lists, physician lists, patient programs, patient charts, records, files, computer data" and all other information relating to, among other things, TCHCVA's business practices, financial and billing information, pricing policies, marketing information, business acquisition plans, new personnel acquisition plans, and technical processes, all defined as "Confidential Information." Employment Agreement, Section 11.D. He also agreed not to solicit any patients of TCHCVA, Employment Agreement, Section 11.E, or to solicit any employee of TCHCVA to leave the practice, Employment Agreement, Section 11.F.

{¶7} With respect to all of these restrictions, Castillo-Sang agreed:

> Physician acknowledges that the terms and conditions of the restrictive covenants in this Agreement are reasonable and necessary

3

for the protection of TCHCVA and Hospital's business, trade secrets and Confidential Information and to prevent damage or loss to TCHCVA and Hospital as a result of actions taken by Physician. The parties further agree that the limitations and parameters put on these covenants are reasonable and should be enforced by any court of competent jurisdiction without variance therefrom.

Employment Agreement, Section 11.G.

{¶8} Castillo-Sang further acknowledged that TCHCVA could seek an injunction in case of breach of any of these restrictions or covenants. Employment Agreement, Section 11.G.

{¶9} Finally, the employment agreement contained the following:

The provisions of this Section 11, regardless of the reasons for termination, shall survive the termination of this Agreement. NOTWITHSTANDING THE FOREGOING, IF THE RESTRICTIONS HEREIN SPECIFIED ARE ADJUDGED UNREASONABLE IN ANY COURT PROCEEDING, THE PARTIES HEREBY AGREE TO THE REFORMATION OF SUCH RESTRICTION BY THE COURT TO LIMITS WHICH IT FINDS TO BE REASONABLE, AND THE PARTIES WILL NOT ASSERT THAT SUCH RESTRICTIONS SHOULD BE ELIMINATED IN THEIR ENTIRETY BY SUCH COURT. THE PARTIES ACKNOWLEDGE THAT THE TERMS OF SECTION 3.A, 10, AND 11 HAVE BEEN NEGOTIATED AT ARM'S LENGTH WITH ADVICE OF COUNSEL. THE PARTIES AGREE SUCH THAT SUCH RESTRICTIONS SHALL BE LEGALLY ENFORCEABLE AND SHALL NOT BE CHALLENGED BY ANY PARTY IN ANY COURT PROCEEDING. THE PHYSICIAN REPRESENTS THAT PHYSICIAN UNDERSTANDS THE FULL EXTENT AND IMPLICATION OF THE

TERMS OF SECTIONS 3.A, 10, AND 11, AND HEREBY KNOWINGLY

AND VOLUNTARILY AGREES TO BE BOUND THEREBY.

(Emphasis in original.)

{¶10} In July 2019, Castillo-Sang informed TCHCVA that he intended to look for other employment. He spoke to individual TCHCVA board members, whom he claims assured him that the board would not enforce the noncompetition restrictions in his employment agreement. In August 2019, Dr. Castillo-Sang asked the TCHCVA board to waive the restrictive covenants contained in the agreement, but the board refused.

{¶11} On December 2, 2019, Castillo-Sang resigned his employment with TCHCVA and accepted an offer of employment from St. Elizabeth Hospital in Edgewood, Kentucky, which is within the agreement's Restricted Area.

### *The Lawsuit*

{¶12} Prior to accepting his position with St. Elizabeth Hospital, Castillo-Sang filed this action against TCHCVA in the Hamilton County Common Pleas Court in November 2019, seeking, among other things,[1] a declaratory judgment that the noncompetition restrictions in his employment agreement were illegal, invalid, and unenforceable. In the alternative, Castillo-Sang sought a declaratory judgment that the "Restricted Area" contained in the covenant not to compete be limited to Hamilton County and/or Hamilton, Butler, Warren, and Clermont counties in Ohio. Castillo-Sang also requested a temporary restraining order ("TRO"), preliminary injunction, and permanent injunction prohibiting TCHCVA from enforcing the noncompetition restrictions against him.

---

[1] Castillo-Sang also asserted claims for promissory estoppel and unlawful discriminatory practices, alleging that he sought local employment in reliance on promises that TCHCVA would not seek to enforce his covenant not to compete and that TCHCVA enforced the restrictive covenants against him and other Hispanic physicians, while waiving and releasing four Caucasian physicians from the same restrictions. These claims remain pending and are not part of this appeal.

{¶13} TCHCVA filed an answer and a counterclaim seeking a declaratory judgment that the restrictions and covenant not to compete contained in Castillo-Sang's employment agreement were reasonable as a matter of law, nonviolative of public policy, and enforceable against Castillo-Sang.

{¶14} In December 2019, Castillo-Sang filed a motion for a TRO and preliminary injunction seeking the same injunctive relief that he sought in his complaint.

{¶15} Following a two-day hearing, the trial court granted Castillo-Sang's motion for a TRO and request for preliminary injunction. The trial court found that there was a substantial likelihood that Castillo-Sang would be successful on the merits of his claims because the noncompetition restriction was greater than required to protect TCHCVA and posed an undue hardship on Castillo-Sang. The court also found that Castillo-Sang would suffer irreparable harm if the injunction was not granted, that no third parties would be unjustifiably harmed if the injunction was granted, and that the public interest would be served by the injunction. This appeal followed.

### *Preliminary Injunction*

{¶16} In a single assignment of error, TCHCVA argues that the trial court erred by granting Castillo-Sang's motion for a preliminary injunction. A party requesting a preliminary injunction must show by clear and convincing evidence that (1) there is a substantial likelihood that she/he will prevail on the merits, (2) she/he will suffer irreparable injury if the injunction is not granted, (3) no third parties will be unjustifiably harmed if the injunction is granted, and (4) the public interest will be served by the injunction. *Procter & Gamble Co. v. Stoneham*, 140 Ohio App.3d 260, 267-268, 747 N.E.2d 268 (1st Dist.2000). In determining whether to grant or deny injunctive relief, a court must balance all four factors, and no single factor is

dispositive. *Brookville Equip. Corp. v. Cincinnati*, 1st Dist. Hamilton No. C-120434, 2012-Ohio-3648, ¶ 11. Whether to grant or deny an injunction is within the discretion of the trial court, and a reviewing court will not disturb the judgment of the trial court absent an abuse of discretion. *Banker's Choice, LLC v. Zoning Bd. of Appeals of City of Cincinnati*, 2018-Ohio-3030, 106 N.E.3d 1271, ¶ 18 (1st Dist.); *Garano v. State*, 37 Ohio St.3d 171, 173, 524 N.E.2d 496 (1988).

### *1. Likelihood of Success on the Merits*

{¶17} With respect to the first element of injunctive relief—the likelihood of success on the merits—TCHCVA argues that Castillo-Sang failed to establish that he is likely to prevail on the merits of his claims to invalidate the covenant not to compete.

{¶18} In *Raimonde v. Van Vlerah*, 42 Ohio St.2d 21, 325 N.E.2d 544 (1975), the Supreme Court of Ohio held that a noncompetition agreement is reasonable "if the restraint is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public." *Raimonde*, at paragraph two of the syllabus. Among the factors to be considered in determining whether a particular noncompetition agreement is reasonable are: (1) whether the agreement contains time and space limitations; (2) whether the employee is the sole contact with the customer; (3) whether the employee has confidential information or trade secrets; (4) whether the covenant seeks to limit only unfair competition or is designed more broadly to eliminate ordinary competition; (5) whether the agreement seeks to stifle the employee's inherent skill and experience; (6) whether the benefit to the employer is disproportional to the detriment to the employee; (7) whether the agreement bars the employee's sole means of support; (8) whether the skills that the agreement seeks to restrain were

7

actually developed during the employment; and (9) whether the forbidden employment is merely incidental to the main employment. *Id.* at 25.

{¶19} Restrictive covenants are disfavored in the law, and "[t]his measure of disfavor is especially acute concerning restrictive covenants among physicians, which affect the public interest to a much greater degree." *Ohio Urology, Inc. v. Poll*, 72 Ohio App.3d 446, 452-453, 594 N.E.2d 1027 (10th Dist.1991). Noncompetition agreements must be strictly construed in favor of professional mobility and access to medical care and facilities. *Riverhills Healthcare, Inc. v. Guo*, 1st Dist. Hamilton No. C-100781, 2011-Ohio-4359, ¶ 23. "[C]ourts have recognized that the greater scrutiny is mandated by public-policy considerations, since limiting the ability of a physician to practice may affect the public's ability to obtain medical care." *Sammarco v. Anthem Ins. Cos.*, 131 Ohio App.3d 544, 551, 723 N.E.2d 128 (1st Dist.1998), *overruled on other grounds*, *Littlejohn v. Parrish*, 163 Ohio App.3d 456, 2005-Ohio-4850, 839 N.E.2d 49. But even though not favored, covenants not to compete in the medical profession are not per se unenforceable, and will be upheld if they are reasonable. *Ohio Urology, Inc.* at 451-452; *Owusu v. Hope Cancer Ctr. of Northwest Ohio, Inc.*, 3d Dist. Allen No. 1-10-81, 2011-Ohio-4466, ¶ 23; *Premier Assoc., Ltd. v. Loper*, 149 Ohio App.3d 660, 2002-Ohio-5538, 778 N.E.2d 630, ¶ 20. And, courts will enforce covenants against physicians to the extent necessary to protect an employer's legitimate interests; if there is no legitimate interest to be protected, the noncompete is unreasonable. *General Medicine, P.C. v. Manolache*, 8th Dist. Cuyahoga No. 88809, 2007-Ohio-4169. ¶ 7.

{¶20} Here, in determining whether the noncompetition agreement between Castillo-Sang and TCHCVA was reasonable, the trial court considered the factors set forth in *Raimonde* and found: that Castillo-Sang is not the sole contact with a patient; that he possessed neither confidential information nor trade secrets; that no credible evidence suggested that unfair competition would result from Castillo-

Sang's hiring by St. Elizabeth and that the agreement merely seeks to eliminate ordinary competition; that the agreement seeks to stifle Castillo-Sang's inherent surgical skill and experience; that the benefit to TCHCVA is disproportional to the detriment to Castillo-Sang if the covenant were enforced; that Castillo-Sang was trained in minimally invasive heart surgery before joining TCHCVA; and that, while he "has honed his craft during his time at TCHCVA, there was no evidence that TCHCVA invested in his training or development."

{¶21} After considering the reasonableness factors, the trial court concluded that the noncompetition agreement was unreasonable because it failed on both the first and second requirements of the *Raimonde* test; specifically, the court found that the agreement's restriction was greater than required to protect TCHCVA and that it posed an undue hardship on Castillo-Sang. Although the trial court did not specifically mention the third requirement of the *Raimonde* test—whether enforcement of the covenant would be injurious to the public—this finding was implicit in the court's statement that Castillo-Sang is one of the very few surgeons in the country capable of performing this minimally invasive heart surgery and that the public would be served by the granting of the preliminary injunction, thus allowing access to this procedure. The court concluded, therefore, that there was a substantial likelihood that Castillo-Sang would be successful on the merits of his action for declaratory and injunctive relief to invalidate the restrictive covenant.

{¶22} We analyze each of the three *Raimonde* requirements to determine whether the trial court abused its discretion in holding that the covenant not to compete was unenforceable.

### A. No Greater Than Required for Protection of Employer's Legitimate Interests

{¶23} Under *Raimonde*, restrictive covenants are enforceable only to the extent necessary to protect an employer's legitimate business interests. *Raimonde*,

42 Ohio St.2d 21, 325 N.E.2d 544, at paragraph one of the syllabus; *Ohio Urology Inc.*, 72 Ohio App.3d at 452, 594 N.E.2d 1027. "The purpose in allowing non-competition agreements is to foster commercial ethics and to protect the employer's legitimate interests by preventing *unfair* competition—not ordinary competition." *Premier Assoc., Ltd.*, 149 Ohio App.3d 660, 2002-Ohio-5538, 778 N.E.2d 630, at ¶ 20. The prevention of ordinary competition is not a legitimate business interest that can be protected by a restrictive covenant. *Busch v. Premier Integrated Med. Assoc., Ltd.*, 2d Dist. Montgomery No. 19364, 2003-Ohio-4709, ¶ 27. Therefore, a covenant not to compete is "valid only when the competition [it] restrict[s] is somehow unfair." *Id.* at ¶ 17.

{¶24} We begin our analysis by reviewing the agreement entered into by Castillo-Sang. In his employment agreement, he specifically acknowledged that the covenant not to compete, as well as the other restrictions, were reasonable and necessary to protect TCHCVA's business, trade secrets, and confidential information such as business plans, acquisition plans, new personnel plans and pricing. Thus, in arguing now that these restrictions were unreasonable, Castillo-Sang was required to present clear and convincing evidence to the trial court that these restrictions were in fact unreasonable.

{¶25} The agreement also recognizes that a court might find some or all of the restrictions to be unreasonable. In such a case, the parties agree that the court should reform the agreement to limits it finds reasonable. The trial court in this case found that the covenant not to compete was broader than required and enjoined TCHCVA from enforcing it. The trial court did not reform the restrictions as to time or geographical limits, presumably concluding that no restriction was reasonable. And, while the agreement also provides that the parties agree that the covenant not to compete is legally enforceable and shall not be challenged in court, neither party is

10

arguing on appeal that this provision prevented the trial court from determining the reasonableness and enforceability of the restrictive covenant.

{¶26} Ohio courts have found legitimate protectable interests in upholding physician covenants not to compete. In *Owusu v. Hope Cancer Ctr. of Northwest Ohio, Inc.*, 3d Dist. Allen No. 1-10-81, 2011-Ohio-4466, the court upheld a physician's two-year covenant not to compete, finding that the medical center had a legitimate business interest in prohibiting the physician from using physician referral connections he developed as a result of employment with the medical center and that he could not use these connections to build a new practice. *See Riverhills Healthcare, Inc. v. Guo*, 1st Dist. Hamilton No. C-100781, 2011-Ohio-4359 (upholding a one-year, five-mile-radius covenant not to compete against a neurologist).

{¶27} Conversely, Ohio courts have refused to enforce covenants not to compete against physicians where there is no legitimate business interest to protect. In *Pratt v. Grunenwald*, 2d Dist. Montgomery No. 14160, 1994 WL 313050 (June 29, 1994), the court found that the covenant failed to meet the first prong of *Raimonde*. It stated:

> As applied to instances involving covenants among physicians, we find that meeting the first prong of the *Raimonde* test requires the employer to prove that some legitimate business interest of the employer—trade secrets, customer lists, inside information, special training, or some other circumstance that makes the employer particularly vulnerable to competition from his former employee—needs protecting, and the trial court must find that the restrictive covenant restrains the employees only to the extent necessary to pr0tect that legitimate business interest. Without the proof of circumstances that threaten the employer with *unfair* competition, the

11

physician employee cannot be constrained because the competition is merely ordinary and its restraint would violate the long-standing public policy against agreements in the restraint of trade.

*Id.* at *2.

{¶28} The court found no evidence that referrals to the physicians were made for any other reason than their personal reputations and that their expertise was increased no more than would have been through experience as cardiologists in solo practice. *Id.* at *3. Finally, the court stated:

That Kupper and Lecher will earn future referrals in their individual practices from some of the same referral sources that they had during their employment at CCI, or that Kupper and Lecher may see patients whom they once treated while employed by CCI, is nothing more than ordinary competition, which cannot be restrained because CCI did not part with any trade secrets, customer lists, specialized training, or any other benefits which allowed Kupper and Lecher to gain past or future referrals to unfair advantage over Grunenwald or CCI. A holding to the contrary would authorize a restrictive covenant, in restraint of trade, for any professional employee who provides services to the public. This would violate the public policy against agreements in restraint of trade.

*Id.*; *see Busch*, 2d Dist. Montgomery No. 19364, 2003-Ohio-4709 (desire to maintain larger size not sufficient justification for covenant not to compete); *Premier Health Care Servs., Inc. v. Schneiderman*, 2d Dist. Montgomery No. 18795, 2001 WL 1658167 (Dec. 28, 2001) (legitimate business interest no longer existed).

{¶29} In this case, we must determine whether the trial court abused its discretion. Key to this determination is whether TCHCVA established it had legitimate business interests to protect. In other words, did Castillo-Sang actually

possess confidential or trade secret information which would allow him to compete unfairly? This analysis focuses on the third and fourth factors *Raimonde* says a court should consider.

{¶30} In its argument that the court erred when it found that the noncompetition agreement seeks to eliminate ordinary, not unfair, competition, TCHCVA asserts that the court ignored evidence related to Castillo-Sang's access to its confidential information and, therefore, the potential for unfair competition. TCHCVA contends that the confidential information that Castillo-Sang had access to included its plans to grow its cardiovascular team, its pricing structure, and its network of referring physicians.

{¶31} We note that TCHCVA has pointed to scant evidence in the record which would support its contention that Castillo-Sang possessed trade secret or other protected confidential information. For example, if TCHCVA could establish that Castillo-Sang knew of particular targeted doctors TCHCVA was recruiting, specific specialty areas it was developing, marketing and business plans targeting particular markets, or profitability analysis, it may be able to show that it would be unfair for Castillo-Sang to use that information to compete with TCHCVA. But that is not what the record establishes.

{¶32} In support of its arguments, TCHCVA points to evidence that it supported and invested in Castillo-Sang's Mitral Valve surgery practice. However, Eugene Chung, M.D., Chief of Cardiology at The Christ Hospital ("TCH"), testified that the investments in facilities and staff that occurred during Castillo-Sang's employment benefitted all of its surgeons and cardiologists and that those investments remained at TCH after Castillo-Sang left.

{¶33} Although TCHCVA asserts that Castillo-Sang had access to its confidential pricing structure, Chung testified that TCHCVA is paid a single surgery fee for cardiac surgery and that the price is set by Medicare, Medicaid, or private

13

insurance. When John Michael Smith, M.D., a cardiac surgeon with TCHCVA, was asked whether it was "some sort of confidential information about what the surgery costs," Smith stated that he did not think it was.

{¶34} With respect to TCHCVA's network of referring physicians, TCH chief business development officer, Victor J. DiPilla, testified that the vast majority, more than 90 percent of the cardiac surgery patients of TCHCVA, come from referrals from TCHCVA's own cardiologists. In addition, he testified that the biggest competitor for TCH is "TriHealth, UC, Mercy," not St. Elizabeth. Chung agreed that "in nearly all instances," cardiac surgery patients have been referred by cardiologists, and that after the surgeon performs surgery and oversees the patients' immediate recoveries, the patients return to their cardiologists for all further care and treatment. Smith and Castillo-Sang both testified that, as cardiac surgeons, they spent no time soliciting cardiac surgery patients or cardiologists to refer them cases.

{¶35} Despite the fact that the employment agreement stated that Castillo-Sang would "keep secret and retain in strictest confidence and shall not use" TCHCVA's confidential information, the record before us contains no facts substantiating that Castillo-Sang actually possessed, let alone used, confidential information. Because there is no evidence of Castillo-Sang's possession or use of TCHCVA's confidential information, there is no evidence that Castillo-Sang unfairly competed with TCHCVA when he went to work for St. Elizabeth Hospital.

{¶36} Finally, we note that Castillo-Sang has a duty not to use or disclose confidential or trade secret information. This duty exists separate and apart from any covenant not to compete. TCHCVA does not claim that he used or disclosed any such confidential or trade secret information.

### B. Undue Hardship on the Employee

{¶37} TCHCVA argues that the trial court erred when it found that the noncompetition agreement poses an undue hardship on Castillo-Sang. It argues that Castillo-Sang voluntarily resigned and that he had an immediate offer for full-time employment at Mt. Carmel Hospital in Columbus, Ohio, which was outside the range of the geographic restriction.

{¶38} Castillo-Sang testified that his wife is a full-time urologic surgeon at a hospital in Cincinnati. They moved to Cincinnati from South Carolina when their daughter was three years old and his wife was pregnant with their second daughter so they could be closer to his wife's family. Their daughters were aged seven and four at the time of the hearing on the injunction. Castillo-Sang's mother-in-law is the children's nanny.

{¶39} Castillo-Sang testified that he deals with life-threatening emergencies, "[w]here if you're not in the operating room within an hour or two of the patient presenting, the patient will die. So time is of the essence." He testified that he did not find any employment that would not require him to move away from his family. The full-time position at Mt. Carmel would require that he find a place in Columbus where he could stay when taking calls and then he would commute from Cincinnati on the other days. However, he testified, "Most of the days I'm envisioning that I would not be able to [commute home] given the caseload. You don't operate on somebody's heart and check out at 3:00 p.m. and go home. You don't do that."

{¶40} As Smith acknowledged, cardiac surgeons do highly skilled and technical work in extremely stressful situations that can involve life and death, and they work long hours, such that exhaustion is a legitimate concern that can impact their patients. Chung testified, "Like all high stress, highly technical and skilled procedures and operations, you want the operator to be as rested or as optimally

ready to do it as possible." Chung testified that the expectation is that a cardiac surgeon who is on call should be able to respond within 30 minutes because time is of the essence. Therefore, the trial court did not abuse its discretion in concluding that the noncompetition agreement placed an undue hardship on Castillo-Sang and therefore failed to meet the second *Raimonde* requirement.

### C. Injurious to the Public

{¶41} TCHCVA argues that the noncompetition agreement is not injurious to the public because patients in the Greater Cincinnati area have a number of options for cardiovascular healthcare only miles from St. Elizabeth. And it argues that the St. Elizabeth cardiac surgeons who were there before Castillo-Sang's recruitment would continue to save lives using sternotomy. However, as Smith testified, St. Elizabeth did not have a surgeon doing minimally invasive Mitral Valve surgeries, which is much less invasive to a patient than a sternotomy. The surgery results in lower risks for stroke, infection, and bleeding, and patients have less pain, shorter hospital stays, and recover more quickly. Smith agreed that as long as the patient is a good candidate, it is always better for the patient to have the minimally invasive surgery instead of the sternotomy. As the trial court noted, Castillo-Sang is one of the few in the country who can perform this surgery. Therefore, the trial court did not abuse its discretion in finding that the noncompetition agreement did not meet the third *Raimonde* requirement.

{¶42} Because the trial court did not abuse its discretion in finding that the noncompetition agreement was greater than necessary to protect a legitimate interest of TCHCVA, imposed undue hardship on Castillo-Sang, and was injurious to the public, the trial court's conclusion that Castillo-Sang was likely to be successful on the merits was supported by clear and convincing evidence.

16

### 2. *Irreparable Injury if Injunction Not Granted*

**{¶43}** TCHCVA correctly argues that if a party's loss can be compensated by money damages, he has not sustained irreparable harm, and therefore injunctive relief is not appropriate.

**{¶44}** Castillo-Sang testified that he found no employment that would not require him to move away from his family. According to Castillo-Sang, Chung told him he would not hold Castillo-Sang to the noncompetition agreement because he had a young family and he would not want them to go through this. Chung acknowledged this statement and said that he did not want Castillo-Sang to have to displace his family from Cincinnati. And Smith testified that he previously worked at Kettering Hospital near Dayton as a part-time surgeon while living in Cincinnati and that he would have had to move there because a two-and-a-half-hour daily commute would have made it hard for him to be readily available to take care of his patients. He agreed that "that's a real thing for surgeons to get burned out, or spend [too] little time with their family." Therefore, the trial court did not abuse its discretion in finding that Castillo-Sang would be irreparably harmed if the injunction is not granted.

### 3. No Third Parties will be Unjustifiably Harmed by Injunction

**{¶45}** TCHCVA does not identify any third party that would be harmed by the granting of the injunction.

### 4. Public Interest will be Served by Injunction

**{¶46}** TCHCVA argues that the public will not be served by the granting of the injunction. It contends that patients in the Greater Cincinnati area have options for cardiovascular healthcare, including TCHCVA, only miles from St. Elizabeth, and that, to the extent patients want to use St. Elizabeth, that hospital had a team of cardiovascular surgeons "saving lives" before Castillo-Sang's recruitment.

17

**{¶47}** Castillo-Sang has the ability to perform minimally invasive heart surgery, a procedure with significant advantages and benefits over the traditional sternotomy. This is not available through others at St. Elizabeth Hospital. Therefore, the trial court did not abuse its discretion in finding that the public interest will be served by the injunction.

### *Conclusion*

**{¶48}** Consequently, we hold that the trial court did not abuse its discretion in granting the preliminary injunction in favor of Castillo-Sang. Therefore, we overrule the assignment of error and affirm the judgment of the trial court.

Judgment affirmed.

**CROUSE** and **WINKLER, JJ.,** concur.

Please note:

The court has recorded its own entry this date.