[Cite as *Apple-Chamberlain v. Apple*, 2025-Ohio-5388.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

SONJA A. APPLE-CHAMBERLAIN, INDIVIDUALLY AND AS TRUSTEE OF THE KAREN D. APPLE TRUST U/T/D/ JUNE 2, 2021; KDSONJA, LLC: AND DEROE LLC

COURT OF APPEALS NO. {87}WD-24-045

TRIAL COURT NO. 2022-9004A

APPELLANT

V.

SCOTT APPLE, INDIVIDUALLY AND AS EXECUTOR OF THE ESTATE OF KAREN D. APPLE; APPLE FARMS, LLC; HENRY APPLE; AND MASON APPLE

**DECISION AND JUDGMENT**

Decided: December 2, 2025

APPELLEE

* * * * *

Matthew D. Harper, Jared J. Lefevre, and
Nicholas W. Bartlett, for appellant/cross-appellee,
Sonja Apple-Chamberlain, KD SONJA, LLC, and
DEROE, LLC.

John A. Borrell, Jr., for appellee/cross-appellant,
Scott Apple, Apple Farms, LLC, Henry Apple, and
Mason Apple.

David Bryan, for appellee/cross-appellant,
Trust Protector.

* * * * *

**OSOWIK, J.**

{¶ 1} Sonja Apple-Chamberlain, Individually and as Trustee of the Karen D. Apple Trust u/t/d June 2, 2021, KDSonja, LLC, and DEROE, LLC (collectively "Sonja"), appeal judgments of the Wood County Court of Common Pleas, Probate Division, journalized on January 25, 2023, February 27, 2023, and May 15, 2024. Scott D. Apple, Individually and as Executor of the Estate of Karen D. Apple, Apple Farms, LLC, Henry Apple, and Mason Apple (collectively "Scott"), appeal the probate court's May 15, 2024 judgment. For the following reasons, we affirm the January 25, 2023 judgment denying Sonja's motion for preliminary injunction, and we affirm, in part, and reverse, in part, its February 27, 2023, and May 15, 2024 judgments.

## I. Background

{¶ 2} Sonja Apple-Chamberlain and Scott Chamberlain are the adult children of David and Karen Apple. David and Karen owned hundreds of acres of agricultural farmland that they farmed until retirement and that Scott and his sons now farm. David and Karen desired for their lineal descendants to continue to farm the land. Represented by the law firm of Marshall & Melhorn, LLC,[1] David and Karen, now deceased, devised an estate plan intended to benefit Scott and Sonja and their children. Problematically, Scott and Sonja do not have a good relationship.

---

[1] Marshall and Melhorn began representing David and Karen Apple in approximately 2006. Another firm drafted the first iteration of David and Karen's trusts.

2.

{¶ 3} On October 19, 1995, David created the David N. Apple Trust ("David's trust"), amended on August 8, 2013. Created within that trust was the David N. Apple Dynasty Trust, formed for the benefit of Scott and his descendants. Karen became the trustee of David's trust after he died on December 9, 2020. Scott succeeded Karen as trustee of David's trust after her death on July 14, 2021. Sonja is a contingent beneficiary of David's dynasty trust, but all of David's bloodline would have to be deceased before Sonja would benefit from that trust.

{¶ 4} Also on October 19, 1995, and amended on August 8, 2013, Karen created the Karen D. Apple Trust ("Karen's trust"), and within it, the Karen D. Apple Dynasty Trust ("Karen's dynasty trust"). Karen's dynasty trust was formed for the benefit of Sonja and her descendants. When Karen died on July 14, 2021, Sonja succeeded Karen as trustee of Karen's trust. Scott is a contingent beneficiary of Karen's dynasty trust, but all of Sonja's bloodline would have to be deceased before Scott would benefit from that trust.

{¶ 5} As part of David and Karen's estate plan, three business entities were formed: (1) KDApple, LLC; (2) KDSonja, LLC, and (3) DEROE, LLC. These three entities hold real estate and are governed by operating agreements. The trustee of David's trust is the sole member of KDApple, and the trustee of Karen's trust is the sole member of KDSonja. As provided in the 2013 amendments to their trusts, upon David and Karen's deaths, Scott, as the trustee of David's trust, would become the sole member of KDApple, and Sonja, as the trustee of Karen's trust, would become the sole member of

3.

KDSonja. As originally drafted, Scott and Sonja would serve as co-managers of KDApple and KDSonja. KDApple owned approximately 620 acres of agricultural real estate. KDSonja owned approximately 403 acres of agricultural real estate. DEROE, which is also a party to this case, also holds real estate, including a trailer park, and it holds some agricultural real estate subject to lease agreements with Henry and Mason. DEROE was to be co-managed by Scott and Sonja.

{¶ 6} Karen was hospitalized at the end of May of 2021, with dangerously high blood sugar. During her hospitalization, Scott communicated directly with Karen's lawyer about changes that Karen purportedly wanted to make to her estate plan; this is something Scott had done many times in the past. Ben Sutter, of Marshall & Melhorn, was by then Karen's primary estate-planning attorney. Scott told Sutter that Karen wanted the manager of KDApple (i.e., Scott) to be the sole manager of KDSonja, and she wanted the manager of KDApple to have the power to exchange any parcel of real estate owned by KDSonja for "a like kind" property.

{¶ 7} On June 2, 2021—the day after Karen was released from the hospital and six weeks before her death—Scott drove Karen to Sutter's office and Karen executed amendments to her trust (1) providing for the appointment of a trust protector, and (2) providing that the *sole* manager of KDApple would be the manager of KDSonja; the amendments to the estate plan did not include the property swap that Scott claimed Karen wanted. The KDApple operating agreement was amended to provide that Scott would be its sole manager. This meant that Scott alone would manage both KDApple and

4.

KDSonja; Sonja was eliminated as a co-manager. Consistent with this amendment to Karen's trust, the operating agreement for KDSonja was similarly amended. The estate plan was also amended such that Sonja became the sole member of DEROE. Sonja learned of all these changes after Karen's death.

{¶ 8} KDSonja was a party to Cash Farm Lease agreements with Apple Farms, LLC, owned and operated by Scott, and with Scott's sons, Henry and Mason Apple; DEROE had a similar agreement with Scott and Apple Farms.[2] Under those agreements, Scott, Henry, and Mason farmed land owned by KDSonja and DEROE. The term of those leases was ten years, but they automatically renewed for new ten-year terms every January.

{¶ 9} Under the June 2, 2021 amendments to the KDSonja operating agreement, the manager of KDSonja —i.e., Scott—had the sole authority to manage, operate, control, and bind the company. KDSonja's only member—i.e., Sonja—explicitly had no such authority. This meant that Scott alone controlled KDSonja's contractual relationships with the companies that he and his sons owned and operated.

{¶ 10} Powerless to terminate the agreements with her estranged brother and nephews' companies or to remove Scott as manager of KDSonja, Sonja resorted to an indirect means of attempting to sever those business relationships. First, she declined to execute documents appointing Scott manager of KDSonja, allegedly impeding Scott's

---

[2] As will be explained, the validity of those agreements is in dispute.

5.

ability to conduct banking and other responsibilities for the company.[3]  Second, she dissolved KDSonja effective June 13, 2022—purportedly under R.C. 1706.47(B).  Before this happened, on April 25, 2022, Scott asked Sutter to appoint a trust protector "to enforce all the terms of the trust as written."  Bridgett Root, the chairperson of Marshall & Melhorn's trusts and estates group and a member of its five-member management committee, appointed David Bryan, Esq. as trust protector.

{¶ 11} Sonja filed a complaint against Scott for declaratory judgment and injunctive relief on September 30, 2022, which she amended on November 14, 2022. Under the amended complaint, she sought a declaration that (1) the trust protector was not validly appointed; (2) Karen's trust is not responsible for paying the trust protector's invoices; (3) the trust protector provision cannot be used to force her to arbitrate her disputes with Scott; and (4) Scott lacked standing to request appointment of a trust protector.  She also sought injunctive relief to halt the trust protector's activities and declaratory judgment that KDSonja was properly dissolved, that Scott cannot remove her as trustee of Karen's trust, and that her filing of the lawsuit did not trigger a no-contest provision in Karen's trust.

{¶ 12} Scott filed an answer and counterclaim on December 27, 2022, amended January 4, 2023, for declaratory judgment, breach of contract, breach of fiduciary duty, and injunctive relief.  He sought (1) a declaration construing the terms of Karen's trust

---

[3] Sonja disputes the necessity of executing such documents.

6.

and declaring the rights of the trustee and beneficiaries; (2) an order declaring that the trust protector was properly appointed and requiring Sonja to cooperate with the trust protector's activities; (3) money damages against both KDSonja and Sonja (4) an order declaring that Sonja's dissolution of KDSonja was invalid and requiring the Ohio Secretary of State to re-establish KDSonja; (5) an order requiring the trustee of KDSonja to appoint Scott the manager of KDSonja; (6) an order declaring that Karen's trust shall not compensate Sonja for the time related to this dispute or pay attorney's fees and costs; (7) an order declaring that Sonja and her descendants are disinherited from Karen's trust; (8) an order declaring the leases with Apple Farms and Henry and Mason Apple to be valid and enforceable; (9) punitive damages, interest, and attorney's fees and expenses; and (11) injunctive relief preventing Sonja from interfering with KDSonja's contracts, interfering with the trust protector's activity, or managing KDSonja's assets, and allowing Scott to manage KDSonja's assets.

{¶ 13} On November 14, 2022, Sonja moved for emergency injunctive relief, seeking to enjoin action by the trust protector. Scott filed a competing motion to enjoin Sonja from contesting the trust protector's appointment and to compel her to cooperate with the trust protector's activities. After an evidentiary hearing, the trial court denied both motions in a judgment journalized on January 25, 2023.

{¶ 14} Sonja and Scott filed cross-motions for summary judgment on January 9, 2024. Sonja and Scott sought summary judgment on several of each other's claims and several of their own claims. The probate court ruled on those motions on February 27,

7.

2024, granting both in part.  Simply stated—we will not fully summarize the substance of those motions here, but rather, will do so in connection with addressing the assignments of error—the court agreed with Sonja that Scott lacked authority to unilaterally request that Sonja be removed as trustee of Karen's trust.  It also concluded as a matter of law that the trust protector was validly appointed.   The remaining issues were reserved for trial.

{¶ 15} The matter was tried to the probate court on April 10 and 11, 2024.  In a written judgment journalized on May 15, 2024, the probate court ruled that (1) Sonja lacked authority to dissolve KDSonja, LLC; (2) her attempt to dissolve KDSonja, LLC triggered the no-contest clause contained in Karen's trust; (3) a trust protector was properly appointed; and (4) various leases claimed by Scott to have been executed by David and Karen before their deaths on behalf of KDSonja and DEROE were valid notwithstanding "incomplete and improper" notarial acknowledgments.

{¶ 16} Sonja appealed.  She assigns the following errors for our review:

> Assignment of Error No. 1:  The Probate Court erred in holding that Plaintiff lacked authority to dissolve KDSONJA, LLC under R.C. 1706.47(B).

> Assignment of Error No.2:  The Probate Court erred in holding that Appellee/Cross Appellant Scott Apple had standing to challenge the dissolution of KDSONJA LLC.

> Assignment of Error No.3:  The Probate Court erred in holding that Plaintiffs dissolution of KDSONJA, LLC triggered the no-contest provision of the Karen D Apple Trust.

8.

Assignment of Error No. 4: The Probate Court erred in holding that the Trust Protector was properly appointed and that the Karen D. Apple Trust is responsible for paying the Trust Protector's fees.

Assignment of Error No. 5: The Probate Court erred in denying Appellant's Motion for Preliminary Injunction to prevent the Trust Protector from taking any action during the pendency of the matter below.

Assignment of Error No. 6: The Probate Court erred in holding that the putative leases relied upon by Appellee/Cross-Appellant Scott Apple and Appellees Apple Farms LLC, Henry Apple, and Mason Apple are valid.

Assignment of Error No. 7: The Probate Court erred in denying Appellants' Motion for Summary Judgment.

{¶ 17} Scott cross-appealed. He assigns the following errors for our review:

Assignment of Error No. 1: The probate court erred by failing to enforce the no contest provision of Karen D. Apple's Trust after finding that Plaintiffs' actions triggered that no contest provision.

Assignment of Error No. 2: The probate court erred by failing to require Plaintiff, in her individual capacity, to bear the attorneys' fees and costs incurred by Appellee/Cross-Appellant, Scott Apple and by the Trust.

## II. Sonja's Appeal

{¶ 18} Sonja's first and second assignments of error require us to examine her authority to dissolve KDSonja and Scott's standing to challenge the dissolution. Her third assignment of error challenges the application of the no-contest provision in Karen's trust, while her fourth and fifth assignments of error challenge the appointment of the trust protector, the obligation to pay the trust protector, and the trial court's refusal to enjoin the activities of the trust protector. Her sixth assignment of error challenges the validity of the leases that David and Karen entered into with Scott, Apple Farms, and

9.

Henry and Mason. Finally, Sonja contends in her seventh assignment of error that the trial court erred in denying her motion for summary judgment.

## A. Authority to Dissolve KDSonja, LLC

{¶ 19} As summarized above, Sonja dissolved KDSonja effective June 13, 2022, purportedly under R.C. 1706.47(B). In her complaint, she sought a declaration that the dissolution was valid and legal, and she moved for summary judgment on this claim. Scott argued that KDSonja's operating agreement enumerated the sole means for dissolving the business and asked the court to declare that the dissolution was invalid. He moved for summary judgment on this related counterclaim and sought an order requiring the Ohio Secretary of State to re-establish KDSonja.

{¶ 20} In its February 27, 2024 judgment on the summary-judgment motions, the trial court acknowledged that KDSonja's operating agreement "contains no language suggesting that the provisions therein are the sole methods intended to dissolve KDSonja." It also acknowledged that "[i]f one of the subsections of R.C. 1706.47 is present, a limited liability company may be dissolved absent express language otherwise—"language which is not present" in the operating agreement. Nevertheless, the trial court denied summary judgment to both Sonja and Scott, instead finding that reasonable minds could differ whether the operating agreement provided the sole means to dissolve KDSonja. Then, following a bench trial, the court concluded that "Sonja's dissolution of KDSonja was against the express terms of both the trust and the KDSonja Operating Agreement." It rejected Sonja's contention that dissolution was necessary to

10.

fulfill Karen's intent. In her first assignment of error, Sonja maintains that the trial court erred, legally, when it concluded that she lacked authority to dissolve KDSonja and that the dissolution violated Karen's trust.

{¶ 21} Appellate review of a summary judgment is de novo, *Grafton v. Ohio Edison Co.,* 77 Ohio St.3d 102, 105 (1996), employing the same standard as trial courts. *Lorain Natl. Bank v. Saratoga Apts.,* 61 Ohio App.3d 127, 129 (9th Dist. 1989). The motion may be granted only when it is demonstrated:

> (1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor. *Harless v. Willis Day Warehousing Co.,* 54 Ohio St.2d 64, 67 (1978), Civ.R. 56(C).

{¶ 22} When seeking summary judgment, a party must specifically delineate the basis upon which the motion is brought, *Mitseff v. Wheeler*, 38 Ohio St.3d 112 (1988), syllabus, and identify those portions of the record that demonstrate the absence of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). When a properly supported motion for summary judgment is made, an adverse party may not rest on mere allegations or denials in the pleadings, but must respond with specific facts showing that there is a genuine issue of material fact. Civ.R. 56(E); *Riley v. Montgomery*, 11 Ohio St.3d 75, 79 (1984). A "material" fact is one which would affect the outcome of the suit under the applicable substantive law. *Russell v. Interim Personnel, Inc.*, 135 Ohio

11.

App.3d 301, 304 (6th Dist. 1999); *Needham v. Provident Bank*, 110 Ohio App.3d 817, 826 (8th Dist. 1996), citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

{¶ 23} Section 14.1 of KDSonja's operating agreement requires dissolution of the company "up on (sic) the first to occur of the following":

> (a)  The sale of all the farmland owned by the Company, or

> (b)  The entry of a decree of judicial dissolution of the Company under Section 1705.47 of the Act.

> (c)  The unanimous agreement of the Managers but only if no descendants of David and Karen is then living who can profitably operate the Farms as described in Section 9.2 above.

R.C. 1706.47(B) permits dissolution of an LLC upon "[t]he consent of all the members." Sonja maintains that the operating agreement does not expressly exclude or limit the application of the Revised Code to the operation of KDSonja, thus R.C. 1706.47 must be read into KDSonja's operating agreement as a matter of law. As such, she insists, as the sole member of KDSonja, she was authorized to dissolve the company under R.C. 1706.47(B).

{¶ 24} Scott responds that Sonja was a member of KDSonja not individually, but as the trustee of Karen's trust. He maintains that Article VIII(A)(4) of the trust prohibited her from dissolving KDSonja until the occurrence of one of the events listed in Article VIII(B)(1). Article VIII(A)(4) provides that the "Membership Interests and assets of KDSonja, LLC shall be retained as part of the Trust Estate until the occurrence of that event set forth in Section (B)(1)." Article VIII(B)(1) states that as to KDSonja, the term

12.

of Karen's dynasty trust would expire at the end of "(a) the Maximum Duration for Trusts defined elsewhere in [the] Agreement, or (b) upon the sale of the last parcel of farm real estate owned by KDSonja, LLC, or (c) upon the death of [Karen's] last surviving descendant, whichever occurs first." Scott insists that even if R.C. 1706.47(B) generally allows for dissolution upon the consent of all members, Karen's trust and the operating agreement prohibit its application here. Scott also argues that (1) Article XXVI(A)(5) of Karen's trust permits Sonja to "participate" in the dissolution of KDSonja, but does not authorize her to "initiate" it, and (2) Article VIII(A)(5) of Karen's trust makes clear that Scott was the manager of KDSonja, and Sonja could not dissolve it. He emphasizes that the trust protector agrees with him that Karen did not intend to give Sonja unilateral power to dissolve KDSonja while it still owned farmland that could be farmed by a lineal descendent.

{¶ 25} Sonja replies that consistent with Article VIII(A)(4), her dissolution of KDSonja did not remove the "Membership Interests and assets of KDSonja, LLC" from the trust estate—her membership interest and the real estate previously held by KDSonja remain in Karen's trust. Moreover, she explains, Article VIII(B)(1) governs divestiture of the real estate once held by KDSonja and does not pertain to dissolution of the company. She insists that there is no meaningful difference between Sonja "participating" in the dissolution and her "initiating" it, and Scott's only authority for arguing otherwise is the trust protector's report, which is not determinative of the legal issues here. Sonja emphasizes again that the operating agreement did not indicate that the three defined

13.

circumstances were the exclusive means for dissolving the company, and there is no express language negating the application of R.C. 1706.47. Sonja submits that under Sections 8.11 and 8.12 of the operating agreement, Scott, as manager of KDSonja, lacked authority to make "Major Decisions"—defined to include dissolution of the company—as "Major Decisions" require approval of the members of the company. Finally, Sonja insists that Article VIII(A)(5) of Karen's trust means only that so long as KDSonja exists, Scott (as manager of KDApple) shall be its manager—it did not prohibit her from dissolving the company.

{¶ 26} Resolution of Sonja's first assignment of error requires us to interpret both Karen's trust and KDSonja's operating agreement. The construction of both the trust and the operating agreement are matters of law that we review de novo. *Arnott v. Arnott,* 2012-Ohio-3208, ¶ 14. Our role is to ascertain and give effect to the settlor's intent. *Id.*, quoting *Saunders v. Mortensen,* 2004-Ohio-24, ¶ 9; *Domo v. McCarthy,* 66 Ohio St.3d 312 (1993), paragraph one of the syllabus. We presume that that intent resides in the language employed in the written instruments. *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.,* 78 Ohio St.3d 353, 361 (1997), quoting *Kelly v. Med. Life Ins. Co.*, 31 Ohio St.3d 130 (1987), paragraph one of the syllabus. To that end, we will look to the plain and ordinary meaning of the language used unless another meaning is apparent from the contents of the agreement. *Tera, L.L.C. v. Rice Drilling D, L.L.C.,* 2024-Ohio-1945.

14.

{¶ 27} The Ohio Supreme Court has recognized that "valid, applicable statutory provisions are part of every contract." (Internal quotations omitted.) *Darwin Limes, L.L.C. v. Limes,* 2007-Ohio-2261, ¶ 25 (6th Dist.), quoting *Holdeman v. Epperson,* 2005-Ohio-3750, ¶ 25 (2d Dist.), quoting *Bell v. Northern Ohio Tel. Co.*, 149 Ohio St. 157, 158 (1848). This court has recognized that this principle is true respecting the Ohio Limited Liability Company Act, R.C. Chapter 1706 et seq. (previously R.C. Chapter 1705 et seq.) and limited liability company operating agreements. *Darwin Limes* at ¶ 25, citing *Holdeman* at ¶ 26. "Provisions in the Ohio Revised Code are read into limited liability company operating agreements, and if inconsistencies exist, the statutes will control." *Id.*

{¶ 28} Indeed, Section 2 of the KDSonja operating agreement provides that the "rights, powers, duties, obligations and liabilities of the Members and Owners shall be determined pursuant to the [Limited Liability Company] Act" and the operating agreement. However, this section also provides that "[t]o the extent that the rights, powers, duties, obligations and liabilities of any Owner are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control."

{¶ 29} Here, Section 14.1 of the KDSonja operating agreement *requires* dissolution of KDSonja—it "shall be dissolved"—under three enumerated circumstances: (a) sale of all the company's farmland, (b) judicial dissolution of the company, and (c) if no descendant of David and Karen is then living who can profitably operate the farms,

15.

unanimous agreement of the managers. But this provision does not state that these are the only circumstances allowing for dissolution of the company.

{¶ 30} As cited by Sonja, in *Smith v. Towslee,* 2024-Ohio-5786 (10th Dist.), the parties' operating agreement enumerated only one method for dissolving the company: a majority vote of the members. The court recognized, however, that the provisions of the Revised Code must be read into the operating agreement, and then-applicable R.C. 1705.47 permitted a member to request judicial dissolution of the company. The court concluded that in specifying only one method for dissolving the company—majority vote—the operating agreement did not preclude judicial dissolution under R.C. 1705.47 because "that statutory provision was also part of the operating agreement." *Id.* at ¶ 36.

{¶ 31} We find the same to be true here. That is, by specifying three circumstances requiring dissolution of the company, the operating agreement did not preclude dissolution accomplished under R.C. 1706.47. And here, R.C. 1706.47(B) permits dissolution with the consent of all members. Sonja is the only member of KDSonja. She was authorized under R.C. 1706.47(B) to dissolve KDSonja.

{¶ 32} Scott insists that Article VIII(A)(4) of the trust prohibited Sonja from dissolving KDSonja until the occurrence of one of the events listed in Article VIII(B)(1). According to Scott, these provisions of Karen's trust and the operating agreement prohibited application of R.C. 1706.47(B). But these provisions do not speak to dissolution of KDSonja—they speak to retention of the assets of KDSonja and expiration of the term of the dynasty trust. The evidence presented in the trial court indicates that

Karen's trust retains ownership of the assets once held by KDSonja, thus Sonja did not act contrarily to Article VIII(A)(4) and (B)(1) when she dissolved KDSonja.

{¶ 33} Scott correctly observes that Article VIII(A)(5) of Karen's trust made clear that Scott was the manager of KDSonja and could not be removed as manager. This is true. But he also states that Article VIII(A)(5) prohibited her from dissolving KDSonja. In fact, Article VIII(A)(5) is silent as to dissolution of KDSonja. What's more, even under Section 8.11 of the operating agreement as amended on June 2, 2021, Sonja—not Scott—was authorized to make "Major Decisions" for the company, defined by Section 8.12 to include dissolution of the company. There is simply nothing in Karen's trust or KDSonja's operating agreement prohibiting Sonja from dissolving KDSonja.

{¶ 34} Finally, Scott urges that Article XXVI(A)(5) of Karen's trust permits Sonja to "participate" in the dissolution of KDSonja, but not to "initiate" it. "Participate" means "to take part in." (*See* https://www.merriam-webster.com/dictionary/participate, accessed August 18, 2025). While "initiate" means "to cause or facilitate the beginning of" (*see* https://www.merriam-webster.com/dictionary/initiate," accessed August 18, 2025), absent some provision to the contrary, we do not interpret Article XXVI(A)(5) as permitting Sonja to *take part in*, but not to *initiate*, dissolution of the business. We interpret "participation" to *include* initiation; it does not exclude it.

{¶ 35} For these reasons, we agree with Sonja that nothing in Karen's trust or KDSonja's operating agreement prevented Sonja from dissolving KDSonja. The trial court erred when it denied her motion for summary judgment on this claim. This means

17.

that the trial court also erred when it granted judgment for Scott on his corresponding counterclaim. Accordingly, we find Sonja's first assignment of error well-taken.

### B. Standing to Challenge the Dissolution

{¶ 36} In her amended complaint, Sonja sought judgment declaring that Scott lacked standing to challenge dissolution of KDSonja. She sought summary judgment on this issue, which the court denied. Instead, the court found that Scott suffered injury when Sonja dissolved KDSonja because it impaired his ability to manage, operate, and control KDSonja's business as provided for in the operating agreement and impacted his ability "to take certain steps as reflected in Scott's deposition and affidavit." The court reaffirmed this conclusion in its May 15, 2024 judgment. In her second assignment of error, Sonja challenges the court's conclusion.

{¶ 37} Sonja argues that as an uncompensated manager who is not a member of KDSonja, Scott lacked standing to challenge the dissolution of the company. She also maintains that dissolution of KDSonja did not impair Scott's right as a contingent beneficiary under Karen's dynasty trust or as a beneficiary of his descendant's separate trust, another sub-trust created under Karen's trust. She insists that Scott has sustained no injury.

{¶ 38} Scott responds that he had standing to challenge the dissolution because he is a beneficiary of Karen's trust, his installment as manager of KDSonja was a key part of Karen's estate plan, and Karen intended for him to continue farming her land. He

18.

maintains that Sonja's dissolution of KDSonja injured these interests. He argues that he—not Sonja—had the power to dissolve KDSonja.

{¶ 39} Sonja replies that Scott has suffered no concrete injury because he is not a current beneficiary of the dynasty trust. She also points out that neither the trust nor the operating agreement requires that only he or his sons be permitted to farm the land. She claims that Scott's "real" injury is that dissolution of KDSonja has prevented him from continuing to self-deal.

{¶ 40} "Standing relates to a party's right to make a legal claim or seek judicial enforcement of a legal duty or right." *Albanese v. Batman*, 2016-Ohio-5814, ¶ 24, citing *Ohio Pyro, Inc. v. Ohio Dept. of Commerce,* 2007-Ohio-5024, ¶ 27, citing *Black's Law Dictionary* 1442 (8th Ed. 2004). One must have standing to invoke the court's jurisdiction. *Id.,* citing *Fed. Home Loan Mtge. Corp. v. Schwartzwald,* 2012-Ohio-5017, ¶ 24. To have standing, the party bringing suit must assert a personal stake in its outcome. *Id.,* citing *Bank of Am., N.A. v. Kuchta,* 2014-Ohio-4275, ¶ 23. A party may establish standing by showing that he "suffered an injury that is fairly traceable to the defendant's conduct and that is likely to be redressed by the requested relief." *Id.,* citing *Moore v. Middletown,* 2012-Ohio-3897, ¶ 22.

{¶ 41} Because we have concluded that the trial court erred when it denied Sonja's motion for summary judgment on her claim for declaratory judgment that KDSonja was validly dissolved—which, by extension, means that it also erred when, after trial, it found in Scott's favor on his corresponding counterclaim—it is not necessary to address Sonja's

19.

claim that Scott lacked standing to challenge the dissolution.  We dismiss as moot Sonja's second assignment of error.

### C.  The No-Contest Provision

{¶ 42} Article XXX of Karen's trust prohibits attempts to contest the trust. Section (A) provides:

> If any person directly or indirectly contests or attacks this Agreement or any trust or beneficial interest created hereunder, under my Will, or under any other trust created by me during my lifetime or at my death, or conspires with or voluntarily assists anyone associated with any such contest or attack, singly or in conjunction with any other person(s), then in that event I specifically disinherit such person, and such person's descendants and all interests and properties given to or created for the benefit of such person and such person's descendants, directly or in trust, under this Agreement or my Will shall be forfeited, and such property shall be disposed as if such person and their descendants had predeceased me.

{¶ 43} Sonja sought a declaration that her conduct in filing this lawsuit did not trigger this no-contest provision.  Scott's counterclaim alleged a corresponding claim seeking the opposite declaration.  In its May 15, 2024 judgment, the trial court concluded that Sonja's actions in dissolving KDSonja triggered the no-contest provision, but "consistent with the terms and intent of the trust," it declined to enforce the provision so long as Sonja re-establishes KDSonja and the operating agreement.  In her third assignment of error, Sonja argues that the trial court erred in finding that the no-contest provision was triggered.

{¶ 44} First, Sonja argues that she did not contest or attack the trust, she did not claim that any provision was invalid, and she did not seek to set aside any term of the

20.

trust. She contends that she has only taken actions that she was entitled—or even obligated—to take as trustee. Second, Sonja claims that under Article XXX(E), the no-contest provision "shall not apply unless and until the Trustee has given written notice of such fiduciary's intent to enforce" the no-contest provision and she is given "the opportunity to voluntarily dismiss or withdraw" any purported contest. She emphasizes that she—the trustee—has given no such notice to herself. Third, she maintains that under Article XXX(F), she has the "sole and absolute discretion" to determine whether the no-contest provision should be invoked, and on September 27, 2022, she executed a "Trustee Determination and Acknowledgment" determining that her actions did not trigger the no-contest provision.

{¶ 45} Scott responds that the trust enumerates certain acts that constitute a contest, including Article XXX(B)(1) and (B)(5), which provide that a contest occurs where a person (1) "unsuccessfully contests or, in any manner, attacks or seeks to impair or invalidate any provision" of the trust; and (2) "uses equitable action or legal process to object to any reasonable construction or interpretation" of the trust. According to Scott, Sonja engaged in conduct prohibited under Article XXX(B)(1) and (5).

{¶ 46} First, Scott maintains that the trust protector determined that Karen did not intend to empower Sonja to dissolve KDSonja, Karen's attorney testified that Karen intended for Scott to farm the land, and Article VIII(A)(5) clearly articulated that Sonja lacked authority to remove Scott as manager of KDSonja. Scott argues that Sonja intentionally dissolved KDSonja to thwart Scott's management when it was clear that to

21.

do so was to defy Karen's intent.  Second, Scott claims that Sonja attacked the trust by refusing to execute documents effectuating Scott's appointment as manager, crippling his ability to manage KDSonja.  Third, Scott contends that while Article XXX(F) may have vested her with discretion to determine whether *others'* conduct triggered the no-contest clause, it did not authorize her to absolve herself of conduct committed in bad faith.  Finally, Scott insists that Sonja indirectly attacked the trust by arguing that Karen lacked testamentary capacity to execute the June 2, 2021 amendments to the trust and operating agreement, and by accusing Scott of unduly influencing Karen.

{¶ 47} In reply, Sonja counters that she was authorized to dissolve KDSonja, and she never sought to set aside any provision of the trust.  She denies that she needed to execute a document to appoint Scott manager and insists that she never sought to remove him as manager.  Sonja maintains that it was appropriate for her to advise the court of the circumstances under which Karen signed the June 2, 2021 amendments because this explained the reasons why she believed that her mother would approve of her actions.  She points out that Article XXX gave her the right to decide when and if to apply the no-contest provision, and she determined that the provision was not triggered.  Sonja suggests that it is Scott, not she, who seeks to ignore the provisions of the trust.

{¶ 48} This assignment of error again requires us to look at the language used in the trust and to examine its plain and ordinary meaning.  *Foster Wheeler Enviresponse, Inc.* 78 Ohio St.3d at 361.  As recited by Scott, Article XXX(B)(1) of Karen's trust provides that a contest occurs where a person "*unsuccessfully* contests or, in any manner,

22.

attacks or seeks to impair or invalidate any provision" of the trust. (Emphasis added.) Even if we assume that Sonja "contested" the trust by dissolving KDSonja and filing the underlying action, our resolution of her first assignment of error renders her "contest" successful. Sonja's conduct, therefore, did not constitute an "unsuccessful contest" of the trust under Article XXX(B)(1).

{¶ 49} As for Article XXX(B)(5), a person is deemed to have contested the trust if he or she "uses equitable action or legal process to object to any reasonable construction or interpretation [of the trust] . . . that is adopted or proposed in good faith by the Trustee." In other words, Article XXX(B)(5) permitted Sonja, as trustee, to adopt or propose a construction or interpretation of the trust, and if that construction or interpretation was reasonable, another beneficiary could be penalized for using the courts to object to that construction or interpretation. This is consistent with Article XXX(D), (E), and (F), which vest much discretion in the trustee to make decisions about which actions should be allowed and to determine the applicability of the no-contest provision. Given that we have adopted Sonja's interpretation of the trust and the operating agreement to permit her to dissolve KDSonja, it necessarily follows that we find her construction and interpretation of those instruments to be "reasonable." Sonja's actions did not trigger the no-contest provision of Karen's trust under Article XXX(B)(5).

{¶ 50} Accordingly, we find Sonja's third assignment of error well-taken.

23.

### D. Appointment of Trust Protector

{¶ 51} Karen's trust permits the appointment of a trust protector under Article XXI(I). It states that "a current beneficiary or then serving Trustee may request that the then serving chairperson of Marshall & Melhorn, LLC appoint a Trust Protector to serve as a Trust Protector hereunder." Scott requested that a trust protector be appointed, and Bridgett Root, the chairperson of Marshall & Melhorn's trusts and estates group and a member of the firm's five-member management committee, appointed David Bryan, Esq. as trust protector. In her amended complaint, Sonja sought a declaration that the trust protector was not validly appointed, and she moved for summary judgment on this claim. Scott counterclaimed for a declaration that the trust protector was validly appointed and that Karen's trust should be responsible for his fees. He, too, moved for summary judgment on this claim. The trial court found that the trust protector was properly appointed and granted summary judgment to Scott and denied summary judgment to Sonja. It reaffirmed its holding in its May 15, 2024 judgment and ordered that Karen's trust pay the trust protector's fees and expenses. In her fourth assignment of error, Sonja argues that the trial court erred.

{¶ 52} Sonja's challenge to the validity of the trust-protector appointment is premised on her contention that (1) Scott is not a "current beneficiary" of the dynasty trust, thus he lacked standing to request the appointment of a trust protector, and (2) Bridgett Root is not the "chairperson" of Marshall & Melhorn, thus she lacked authority to appoint a trust protector.

{¶ 53} Scott concedes that he is not a current beneficiary of the dynasty trust, however, he insists that he is nevertheless a current beneficiary "of the Trust itself," rendering him eligible to seek the appointment of a trust protector. As to Root's position at Marshall & Melhorn, Scott highlights Sutter's testimony at the preliminary-injunction hearing, where he testified that he made a scrivener's error when he wrote that "the Chairperson of Marshall & Melhorn" would appoint a trust protector. Sutter explained that Marshall & Melhorn has no "chairperson"—at the time this dispute arose, it was governed by a five-person management committee. Sutter maintained that it was intended that the Chair of Marshall & Melhorn's *trust and estates practice group* would make the appointment; Brigett Root was the chair of that group and a member of the five-person management committee.

{¶ 54} Sonja replies that Scott, as "an exceedingly remote and contingent beneficiary" of the dynasty trust, did not have the right to request the appointment of a trust protector to survey issues relating *only* to the dynasty trust. As to the process for appointing the trust protector, she maintains that the claim of a scrivener's error—made by the law firm that both drafted the trust and made the appointment—"should not be employed to cure this failure to take the specific step required by the Trust."

{¶ 55} Article XXI(H) of Karen's trust defines "beneficiary" for purposes of Article XXI:

> The term "beneficiary" shall mean any person who is named as a recipient of property under this Agreement or who is, or in the future may be, eligible to receive income or principal under any trust created

25.

hereunder, or have the right to use any property owned by any trust created hereunder. A person shall be considered a beneficiary for purposes of this Article even if his or her only interest is as a potential distributee or user of trust property under a discretionary power held by a Disinterested Trustee of any trust created hereunder, but shall not be considered a beneficiary for such purpose if his or her only interest hereunder is as a potential appointee under any non-fiduciary power of appointment held by any person, the exercise of which will take effect only in the future, such as a testamentary power held by a living person.

{¶ 56} As observed above, Article XXI(I) permits "a *current* beneficiary or then serving Trustee" to "request that the then serving chairperson of Marshall & Melhorn, LLC, appoint a Trust Protector to serve as Trust Protector hereunder." (Emphasis added.) Article XXI(K)(5) empowers the trust protector, "upon request by Trustee or a beneficiary of the Trust," to "interpret the terms of the Trust as to [Karen's] intent." It provides that "[t]he interpretation of the Trust Protector shall be binding and conclusive on all parties to the Trust for all purposes."

{¶ 57} Sonja insists that because Scott is not a current beneficiary of the *dynasty* trust and has no current economic or beneficial interest in that trust, Scott lacked standing to request appointment of a trust protector. Scott concedes that he is not a current beneficiary of the dynasty trust, but contends that he is a current beneficiary of the trust itself. Scott does not articulate his rationale for this statement, but he points to Sutter's testimony, offered at the hearing on the motion for preliminary injunction. There, Sutter, explained that after Karen died, all her assets were collected into an administrative trust, which would be distributed into sub-trusts "intended by Karen to be held for different lengths of time for different beneficiaries and for different purposes." Although not

26.

entirely clear from the testimony, Sutter suggested that so long as Karen's estate remained open, the administrative trust would remain in existence. Sutter testified that Scott and Sonja were the beneficiaries of that administrative trust, thereby rendering Scott a "current beneficiary" of "the trust."

{¶ 58} "Current beneficiary" is not defined in Karen's trust. R.C. 5801.01(F) defines "current beneficiary" to mean "a beneficiary that, on the date the beneficiary's qualification is determined, is a distributee or permissible distributee of trust income or principal."

{¶ 59} Certainly, the term "beneficiary" broadly includes anyone who stands to benefit at any time under any trust created within Karen's trust. But the express language of Article XXI(I) uses "current" to modify "beneficiary." "Interpreting a trust is akin to interpreting a contract[.]" *Arnott*, 2012-Ohio-3208, at ¶ 14. In interpreting a contract, a court must "avoid any interpretation that would render terms or provisions superfluous or meaningless." *Eagle Realty Investments, Inc. v. Dumon*, 2022-Ohio-4106, ¶ 12 (1st Dist.). "Current" must, therefore, carry significance.

{¶ 60} Here, as both parties addressed in the probate court and as made clear by the plain language of the instrument, Karen's trust created various sub-trusts—e.g., the residual trust fund, the dynasty trust, the descendants' separate trusts, the discretionary trust. Karen's trust—the broader trust agreement—contains provisions applicable across all the sub-trusts; the converse is not true, however. As Sutter pointed out, the sub-trusts were "held for different lengths of time for different beneficiaries and for different

27.

purposes." To that end, a "beneficiary" of one sub-trust may not be a "beneficiary" of another trust, let alone a "current beneficiary." "*Current* beneficiary" suggests that the beneficiary has a *present* interest in the *particular* trust that the trust protector is being requested to become involved with—not a stake in *any* trust or in a trust that he may never benefit from. And Scott's request for the appointment of a trust protector makes clear that his request was made not as a "current beneficiary" of the particular trust at issue, but as the manager of that trust, of which he is only a contingent, remote beneficiary. He wrote to Sutter: "I am unable to fulfill my business obligations specified in the Karen Apple Trust as a manager of KDSONJA LLC due to Sonja Chamberlain's inaction, which as I read it constitutes a contest of the trust." His request is silent as to any alleged interest as a "current beneficiary."

{¶ 61} It is true that Article XXI does not expressly state that a beneficiary may request a trust protector's appointment only as to a sub-trust under which he or she presently stands to benefit. But as we interpret Article XXI(I), in the context of the trust as a whole—recognizing that there are varying interests in the sub-trusts ("different lengths of time," "different beneficiaries," "different purposes")—and without ignoring the limitation of "beneficiary" created by the modifier "current," we conclude as a matter of law that under the plain language of the instrument, Scott was not authorized to request appointment of a trust protector concerning the dynasty trust, of which he is not a current beneficiary. As such, the trust protector was not validly appointed. The trial court erred

28.

when it granted summary judgment to Scott and found in Scott's favor concerning the trust-protector appointment.

{¶ 62} We find Sonja's fourth assignment of error well-taken.

### E. Denial of Preliminary Injunction

{¶ 63} Sonja filed a motion for preliminary injunction seeking to enjoin the activities of the trust protector. The trial court denied her motion, in part because Sonja failed to demonstrate irreparable harm. In her fifth assignment of error, Sonja argues that the trial court erred in denying her motion.

{¶ 64} A party seeking a preliminary injunction must show by clear and convincing evidence that "(1) there is a substantial likelihood that the plaintiff will prevail on the merits, (2) the plaintiff will suffer irreparable injury if the injunction is not granted, (3) no third parties will be unjustifiably harmed if the injunction is granted, and (4) the public interest will be served by the injunction." *Procter & Gamble Co. v. Stoneham,* 140 Ohio App.3d 260, 267 (1st Dist. 2000); *Southwestern Ohio Basketball, Inc. v. Himes*, 2021-Ohio-415, ¶ 33 (12th Dist.). We review a trial court's denial of a motion for preliminary injunction under an abuse-of-discretion standard. *Twang, LLC v. Cincinnati,* 2024-Ohio-6077, ¶ 46 (1st Dist.), citing *Castillo-Sang v. Christ Hosp. Cardiovascular Assocs., LLC,* 2020-Ohio-6865, ¶ 16 (1st Dist.). To warrant reversal, the plaintiff must show that "the trial court's denial of its motion was an unwarranted exercise of its discretionary authority." *Id.,* citing *Stratman v. Durrani,* 2023-Ohio-3035, ¶ 13 (1st Dist.). Importantly, courts lack discretion to make errors of law. *Id.,* citing

29.

*State v. Austin*, 2021-Ohio-3608, ¶ 5 (1st Dist.), citing *Johnson v. Abdullah,* 2021-Ohio-3304, ¶ 39.  As such, "we 'review legal issues decided within the injunction framework under a de novo standard.'"  *Id.,* quoting *State v. City of Cincinnati Citizen Complaint Auth.,* 2019-Ohio-5349, ¶ 21 (1st Dist.).

{¶ 65} Sonja argued that she would be irreparably harmed here because allowing the trust protector activities to continue would force her into "an unlawful and improper arbitral process."  The trial court disagreed and found that (1) there had been nothing to suggest that Sonja could not avail herself of certain court remedies should Scott seek to enforce the recommendations or conclusions of the trust protector; and (2) the trust protector's opinion would not necessarily be determinative of legal issues, but would be treated more like an expert opinion.

{¶ 66} "'An irreparable injury is one for the redress of which, after its occurrence, there could be no plain, adequate and complete remedy at law, and for which restitution in specie (money) would be impossible, difficult or incomplete.'"  *Cleveland v. Cleveland Elec. Illum. Co.,* 115 Ohio App.3d 1, 12 (8th Dist. 1996), quoting *Ohio Turnpike Comm. v. Texaco*, 35 Ohio Misc. 99, 105 (1973).  Although we concluded above that as a matter of law, under the plain language of Karen's trust, the trust protector was not validly appointed, we cannot say that the trial court abused its discretion when it concluded that Sonja failed to demonstrate by clear and convincing evidence that she would be irreparably harmed if the trust protector's activities were permitted to continue.  The court made clear that Sonja could avail herself of court remedies and the trust protector's

30.

opinion would not be determinative of legal issues. A remedy at law was, therefore, possible, thus we find no error in the trial court's denial of her motion for preliminary injunction.

{¶ 67} Accordingly, we find Sonja's fifth assignment of error not well-taken.

### F. Validity of Leases

{¶ 68} Karen and David executed several leases permitting Scott and Apple Farms and Henry and Mason to farm certain land owned by KDSonja and DEROE. Sonja argued in the probate court that those leases cannot be enforced because they are defective. The probate court disagreed. In her sixth assignment of error, Sonja argues that this was error.

{¶ 69} "In an appeal from a civil bench trial, we generally review the trial court's judgment under a manifest-weight standard of review." *Mike McGarry & Sons, Inc. v. Construction Resources One, LLC,* 2018-Ohio-528, ¶ 90 (6th Dist.), citing *United States Fire Ins. v. Am. Bonding Co.*, 2016-Ohio-7968, ¶ 16-17 (1st Dist.). "We weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the trial court clearly lost its way and created such a manifest miscarriage of justice that its judgment must be reversed and a new trial ordered." *Id.,* citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. "Where, however, the trial court's judgment is based upon a question of law, we review the trial court's determination of that issue de novo." *Id.,* citing *Taylor Bldg. Corp. of Am. v. Benfield*, 2008-Ohio-938, ¶ 34.

31.

{¶ 70} The challenged leases were identified at trial as Exhibits I, J, and L. Sonja argued in the probate court that Exhibits I and J were defective and invalid because the notary who acknowledged David and Karen's signatures wrote only the month and day she acknowledged execution of the documents—she did not include the year. Sonja claimed that Exhibits I, J, and L were defective because David and Karen purportedly signed those leases on behalf of KDSonja and DEROE, but did not identify in what capacity they were signing—i.e., member, manager, or agent.

{¶ 71} Scott responds that (1) the validity of the leases is ultimately moot because Scott, not Sonja, is the manager of KDSonja, and Scott (as manager) has the authority to recognize or enforce the leases; (2) the leases were validly executed and acknowledged under R.C. 5301.01 because they were acknowledged, signed by David and Karen Apple on behalf of KDSonja, LLC, and contained compliant notary acknowledgments; (3) Sonja presented no evidence that the leases were not properly signed by her parents, nor did she provide evidence of fraud or coercion; and (4) the leases have been acted upon for years in a manner consistent with Karen's estate plan.

{¶ 72} Under R.C. 5301.01(A), a lease of an interest in real property "shall be signed by the . . . lessor . . .[and] shall be acknowledged by the . . . lessor . . . before a . . . notary public . . . who shall certify the acknowledgement and subscribe the official's name to the certificate of the acknowledgement." Under R.C. 147.542(F)(3), "[a] notarial certificate shall show . . . [t]he date on which the notarial act was performed[.]"

32.

**{¶ 73}** After hearing the parties' evidence, the probate court found that Sonja had presented no evidence of fraud, Scott testified that he witnessed David and Karen sign at least two of the leases in the presence of the notary, their signatures were legitimate, and the named parties' roles were clear from the text of each lease. It held that the lease agreements were "properly executed and valid contracts" as to both KDSonja and DEROE, and it declared judgment in favor of Scott. It stayed Scott's claims for breach of contract and damages pending mediation and arbitration in accordance with dispute resolution clauses contained within the leases.

**{¶ 74}** To be sure, compliance with R.C. 147.542(F)(3) is mandatory. *See* R.C. 147.542(F) ("A notarial certificate shall show all of the following information . . . ."). But where there has been a failure to adhere to statutory execution and acknowledgment formalities, courts have examined whether there was substantial compliance with those formalities or whether a substantial defect renders the document ineffective. *State v. Pelfrey,* 2022-Ohio-721, ¶ 56, 60 (2d Dist.); *Fragola v. Graham,* 2016-Ohio-8281, ¶ 12 (9th Dist.). In *Fragola,* for instance, the court determined that there was not substantial compliance where the acknowledgment clause in a deed did not state the name of the grantor or include the date of acknowledgment. Notably, the deed in *Fragola* lacked any indication of the date of execution either in the body of the deed or in the acknowledgment clause.

**{¶ 75}** Here, as to Exhibits I and J, the full date is contained in the body of those agreements and on the unacknowledged signature pages, and the date corresponds with

33.

the month and day contained in the acknowledgment clauses.  We conclude that under these facts, the absence of the year in the acknowledgment clauses does not render Exhibits I and J ineffective.

{¶ 76} As to Exhibits I, J, and L and David and Karen's failure to indicate in what capacity they purported to bind KDSonja and DEROE, the signature blocks evidence that they were signing on behalf of KDSonja or DEROE, and Sonja does not argue that either David or Karen lacked authority to bind those companies.  Whether they signed as manager, member, or agent is of little consequence without some allegation that they could not properly bind the company.

{¶ 77} Accordingly, we conclude that the "defects" identified by Sonja do not render the leases invalid.  We find Sonja's sixth assignment of error not well-taken.

## G.  Denial of Summary Judgment

{¶ 78} In her seventh assignment of error, Sonja argues that the trial court erred when it denied her motion for summary judgment on her claims that (1) she was authorized to dissolve KDSonja; (2) her conduct did not trigger the no-contest provision; (3) she did not breach her fiduciary duty to the trust[4]; and (4) the trust protector's appointment was invalid.  For the reasons described above, we agree with Sonja that the

---

[4] We add the caveat that on the issue of breach of fiduciary duty, summary judgment should have been granted in favor of Sonja only as it relates to the dissolution of KDSonja and appointment of the trust protector.  We make no judgment concerning the claims concerning Sonja's actions surrounding the leases because these contract claims were referred for alternative dispute resolution.

34.

trial court erred when it denied her motion for summary judgment on these claims. We find her seventh assignment of error well-taken.

### III.  Scott's Cross-Appeal

{¶ 79} In his first assignment of error, Scott argues that the trial court erred in failing to disinherit Sonja under the no-contest provision of the trust. In his second assignment of error, he argues that the trial court erred in failing to require Sonja, individually, to bear attorney's fees and costs incurred in this case by both her and Scott. For the reasons explained above, we dismiss as moot both of Scott's assignments of error.

### IV.  Conclusion

{¶ 80} We find Sonja's first, third, fourth, and seventh assignments of error well-taken. We dismiss as moot her second assignment of error. We find her fifth and sixth assignments of error not well-taken.

{¶ 81} As to Sonja's first assignment of error, we conclude that the terms of the operating agreement did not provide the sole means for dissolving KDSonja and did not preclude Sonja from dissolving the company under R.C. 1706.47(B). Given our resolution of Sonja's first assignment of error, it is unnecessary for us to decide whether Scott lacked standing to challenge dissolution of KDSonja, therefore, we dismiss as moot her second assignment of error.

{¶ 82} As to Sonja's third assignment of error, we conclude that Sonja's conduct did not trigger the no-contest provision of the trust because (1) even if Sonja's conduct

35.

could be characterized as a "contest" of the trust, that contest was successful; and (2) Sonja did not object to a reasonable construction or interpretation of the trust.

{¶ 83} As to Sonja's fourth assignment of error, because Scott purported to request the appointment of a trust protector as the manager of KDSonja and was not a current beneficiary of the dynasty sub-trust, we conclude that he lacked authority to do so, thus the trust protector was not validly appointed. But as to Sonja's fifth assignment of error, the trial court did not abuse its discretion when it denied Sonja's motion for preliminary injunction on the basis that Sonja failed to demonstrate by clear and convincing evidence that she would be irreparably harmed by his continued activities.

{¶ 84} As to Sonja's sixth assignment of error, we conclude that the defects identified by Sonja did not render the Cash Farm Lease agreements invalid because (1) the full date the leases were executed is contained in the introductory paragraph of the agreements and on the preceding, unacknowledged signature page; and (2) it is clear that David and Karen signed the agreements on behalf of KDSonja and DEROE, and in the absence of evidence indicating that they lacked authority to bind the companies, the failure to identify their titles was of no consequence to the validity of the agreements.

{¶ 85} As to Sonja's seventh assignment of error, we conclude that the trial court erred when it denied her motion for summary judgment on her claims that (1) she was authorized to dissolve KDSonja; (2) her conduct did not trigger the no-contest provision; (3) she did not breach her fiduciary duty to the trust when she dissolved KDSonja and

36.

challenged the appointment of the trust protector; and (4) the trust protector's appointment was invalid.

{¶ 86} Given our resolution of Sonja's assignments of error, we dismiss as moot Scott's first and second assignments of error.

{¶ 87} We affirm the January 25, 2023 judgment of the Wood County Court of Common Pleas, Probate Division, denying Sonja's motion for preliminary injunction  We affirm, in part, and reverse, in part, its February 27, 2023, and May 15, 2024 judgments  This matter is remanded to the probate court for proceedings consistent with this decision.  Sonja and Scott are ordered to share in the costs of this appeal under App.R. 24.

Judgment affirmed, in part,<br>
reversed, in part, and remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.           _____
                                                  JUDGE

Gene A. Zmuda, J.            

                                    _____

Myron C. Duhart, J.                                   JUDGE
CONCUR.

                                    _____
                                                  JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.